Norman M. Semanko, ISB No. 4761
Bryce C. Jensen, ISB No. 10324
PARSONS BEHLE & LATIMER
800 W. Main Street, Suite 1300
Boise, ID  83702
Telephone:  (208) 562-4900
Facsimile:  (208) 562-4901
Email:  NSemanko@parsonsbehle.com
          BJensen@parsonsbehle.com

Attorneys for Plaintiff
Idaho State Snowmobile Association

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO STATE SNOWMOBILE ASSOCIATION,<br><br>                    Plaintiff,<br><br>v.<br><br>U.S. FOREST SERVICE; THE SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, in his capacity as Acting Forest Supervisor for the Sawtooth National Forest; and MIKE DETTORI, in his capacity as District Ranger for the Fairfield Ranger District,<br><br>                    Defendants. | Case No. _____<br><br>COMPLAINT |

Plaintiff Idaho State Snowmobile Association ("Plaintiff" or "ISSA"), by and through its undersigned counsel of record, Parsons Behle & Latimer, and by way of complaint against Defendants the United States Forest Service, the Sawtooth National Forest, Jim DeMaagd ("DeMaagd"), and Mike Dettori ("Dettori") (collectively, "Defendants"), hereby alleges and avers as follows.

COMPLAINT - 1
4833-4773-5947v1

## INTRODUCTION

1. This action seeks declaratory and injunctive relief regarding the Over-snow Vehicle Travel Management in the Northern Portion of the Fairfield Ranger District Final Decision Notice and Finding of No Significant Impact and associated actions (the "Decision") taken by Defendants. The Decision was issued on December 18, 2018.

2. The Decision prohibits snowmobile use on 85,266 acres of public land in the Fairfield Ranger District based on purported environmental concerns that find no basis in the record. Instead, the Decision admittedly "assumes" that snowmobiling in these closed areas will have adverse environmental impacts without any solid scientific evidence.

3. The Decision is arbitrary and capricious under the Administrative Procedures Act ("APA"), fails to comply with the National Environmental Protection Act ("NEPA"), and violates the National Forest Management Act ("NFMA").

## PARTIES

4. Plaintiff ISSA is, and at all times relevant hereto was, a statewide organization representing 41 clubs including the Magic Valley Sno-Mobile Club, the Northside Snow Riders, the Idaho West Magic Lake Rec Club Dam Fools as well as numerous individuals and businesses throughout Idaho. ISSA members highly value and frequently utilize the opportunity to ride snowmobiles in the national forests, including the Sawtooth National Forest and the Fairfield Ranger District in particular.

5. Defendant United States Forest Service is a federal agency within the United States Department of Agriculture. The Forest Service is charged with administering and overseeing the United States National Forest System lands in accordance with applicable law.

6. Defendant Sawtooth National Forest is a subunit of the United States Forest Service within the agency's Intermountain Region. The Sawtooth National Forest's main office is in Jerome, Idaho, and the Fairfield Ranger District office is in Fairfield, Idaho.

7. At all times relevant hereto, Defendant DeMaagd was the Forest Supervisor of the Sawtooth National Forest. As the Forest Supervisor, DeMaagd is the ultimate authority for the procedures, actions, and decisions of the Forest and is charged with ensuring the Forest complies with applicable law. Forest Supervisor DeMaagd is sued solely in his official capacity.

8. At all times relevant hereto, Defendant Dettori was the District Ranger for the Fairfield Ranger District, which is a subunit of the Sawtooth National Forest. District Ranger Dettori signed the Decision and is responsible for interpreting and implementing the Decision's prescriptions. District Ranger Dettori is sued solely in his official capacity.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

10. Venue is proper in this Court under 28 U.S.C. § 1391(e).

## BACKGROUND

11. The Fairfield Ranger District is a destination for a variety of winter recreation activities, including backcountry snowmobiling.

12. The Sawtooth National Forest Land and Resource Management Plan (the "Forest Plan") specifically contemplates providing abundant access to backcountry snowmobilers. The Forest Plan states that its goals include providing "an array of winter recreation experiences, while mitigating conflicts between motorized and non-motorized use and wintering wildlife." In addition, the Forest Plan's specific objectives include providing "networks of marked and

designated snow machine . . . routes and trailhead facilities" and "opportunities for backcountry winter recreation in areas without wintering wildlife conflicts."

13.     Since 1974, the Fairfield Ranger District, in cooperation with the Idaho Department of Fish and Game has managed wintertime motorized vehicle closures to protect wintering wildlife, primarily elk. Prior to the Decision, the winter closure area constituted a relatively narrow strip of land stretching from east to west starting near Couch Summit, continuing along the South Fork of the Boise River, and ending at the western edge of the Fairfield Ranger District, near the town of Featherville. Monitoring of elk in the closure area along the Little and Big Smoky Creeks suggests that elk are no longer wintering in the eastern portion of the closure area.

14.     Aside from this narrow strip of land, practically all the public land within the Fairfield Ranger District was open to snowmobiling during the winter. However, the area north of the closure area was difficult to access during the winter due to the closure area acting as a legal barrier and the terrain to the east of the closure area acting as a physical barrier.

15.     Numerous individuals own private land north of the closure area. During the winter, the only practicable way of accessing most of this private land is by traveling by snowmobile or other over-snow vehicles ("OSVs") through the closure area on Forest Roads 094, 227, and 012, known as the Couch Summit to Fleck Summit corridor.

16.     Even though motorized travel through the Couch Summit to Fleck Summit corridor would ordinarily be prohibited during the winter, federal law entitles these private landowners to access their property for "reasonable use." Prior to the Decision, these private landowners could obtain permits for themselves and their guests to use snowmobiles and other OSVs to access their property during the winter via the Couch Summit to Fleck Summit corridor. As a result, these

landowners and their permitted guests had practically unimpeded access to the public lands that lie north of the closure area.

17. According to the Decision, the Fairfield Ranger District received numerous requests to open the Couch Summit to Fleck Summit corridor for public snowmobile use during the winter so that all members of the public could access the land north of the closure area.

18. According to the Decision, "the recent changes in how elk are using the area, the need to address landowner and public access issues through the closure area, and the challenges of effectively managing a permit system prompted the review of OSV travel for this area." Consequently, the Fairfield Ranger District initiated site-specific travel management planning for the area starting at the southern boundary of the closure area to the District's northern border (the Analysis Area).

19. The Forest Service identified the following five needs that the travel plan was intended to address:

   a. Provide access for private landowners to their properties;

   b. Address the inequity of allowing private land owners access to the area north of the closure area, but not the public;

   c. Provide opportunities for backcountry winter recreation in areas without winter wildlife conflicts;

   d. Manage motorized travel and travel-related facilities that meets resource objectives and access needs; and

   e. Provide winter habitat security for mountain goats and reproductive denning habitat security for wolverine in the headwaters area of the South Fork Boise River by minimizing disturbance from winter recreation activities.

COMPLAINT - 5
4833-4773-5947v1

20. After taking public comment, the Forest Service conducted an Environmental Assessment (EA), analyzing four alternative actions.

21. Under Alternative 1, the then existing closure policy would remain in place.

22. Under Alternative 2, the Forest Service would open the Couch Summit to Fleck Summit corridor for public OSV use during the winter, and the Forest Service would authorize 13.1 miles of new groomed snowmobile trail on the existing Forest Service roads. However, the Forest Service would close an additional 72,447 acres of public land in the northern portion of the Fairfield Ranger District to OSV use. Under this alternative, the permit system would be eliminated.

23. Under Alternative 3, the current closure area and permit system would remain in place. In addition, the Forest Service would expand the closure area to include all the public land north of the original closure area. Alternative 3 would prohibit both the private landowners and the general public from using OSVs on public land north of the closure area.

24. Under Alternative 4, the Forest Service would open the Couch Summit to Fleck Summit corridor for public OSV use during the winter and would authorize 13.1 miles of new groomed snowmobile trail on the existing Forest Service roads. Under this alternative, the permit system would be eliminated, and the public would still be able to access the public land north of the closure area.

25. The EA analyzed the predicted effects on elk, mountain goats, wolverine, lynx, and gray wolves under each proposed alternative action. Based on the analysis in the EA, District Ranger Dettori issued the Decision, adopting Alternative 2.

26. District Ranger Dettori rejected Alternative 4, because the EA incorrectly found Alternative 4 would likely have adverse effects on mountain goats, wolverine, and lynx. That finding was not based on reliable or high-quality scientific evidence.

27. A small population of mountain goats is known to exist on the north end of the Fairfield Ranger District. That area was open to snowmobiling prior to the Decision.

28. The EA concedes that "[i]n general, there is segregation between winter recreationists and winter mountain goats since recreationists do not tend to seek out rocky, rugged terrain and low snow conditions as sought out by mountain goats." However, the EA concluded that there was still a "potential for interaction." According to the EA this potential interaction could possibly have negative impacts on mountain goats, but the EA admits that the scientific literature is sparse regarding this issue.

29. Prior to the Decision, snowmobilers had been routinely accessing and utilizing the north end of the Fairfield Ranger District. In fact, while access to the north of end of the District was somewhat limited due to the existing closure area, the EA conceded the "ineffectiveness of the existing closure between Couch and Fleck Summits (due to the number of landowners and guests riding through)." Moreover, the EA noted that, prior to the Decision, "due to the close proximity of occupied wintering mountain goat habitat and areas known to be travelled by over-snow vehicles, some level of disturbance [was] likely."

30. Despite this repeated use by snowmobilers, Idaho Fish and Game ("IDFG") aerial surveys have found that the population of mountain goats in the north end of the Fairfield Ranger District has steadily increased over the last 25 years. In fact, Idaho Fish and Game instituted a hunting season for mountain goats in the Fairfield Ranger District in 2005. IDFG recently increased the number of permits available to hunters, demonstrating the steady increase and

viability of the mountain goat population in the Fairfield Ranger District despite the supposed occasional disturbances caused by snowmobilers.

31. There is no evidence that snowmobile use has had or will have an adverse impact on the mountain goat population in the Fairfield Ranger District. However, relying on the EA, District Ranger Dettori arbitrarily and capriciously found that "[w]intering mountain goats will benefit" from closing access to snowmobilers in the north end of the Fairfield Ranger District.

32. Wolverines are known to occur on the Fairfield Ranger District, including in the area subject to closure under Alternative 2. However, according to the EA, "[i]ndividual animals generally have very large ranges and can cover large distances in very little time. In central Idaho home ranges average 384 square kilometers (148 square miles) for females and 1,582 square km (582) square miles for males."

33. Despite several scientific studies of wolverines that included the Fairfield Ranger District, no wolverine dens have been observed on the Fairfield Ranger District. The EA contends that despite any direct observation of any wolverine dens, up to two dens "may occur" within the Analysis Area. This conclusion is entirely speculative given the "very large ranges" of individual wolverines.

34. The EA notes "that wolverines appear to tolerate winter recreation in their home ranges, including denning females." In addition, the EA found that "[p]otential wolverine habitats that have even high levels of winter recreation may support resident wolverines despite the potential for human disturbance."

35. Relying on the EA, the Decision concluded there was "compelling evidence for securing areas free of disturbance within wolverine home ranges during the denning period." Paraphrasing an uncompleted study on the impact of winter recreation on wolverines, the Decision

noted that "further research is needed to link population level metrics to habitat and habitat conditions." The Decision then claimed that "clearly at some point, displacement from high quality habitats would affect the reproductive and survival fitness of wolverines." However, the Decision does not identify at what "point" these effects might occur and does not attempt to identify any means of mitigating the risk of these possible effects short of entirely banning snowmobile access as proposed in Alternative 2.

36.     Even though no wolverine denning has ever been observed in the Fairfield Ranger District and there is no evidence that Alternative 4 would impact wolverine reproduction or survival, the Decision adopted Alternative 2 and closed the north end of the Fairfield Ranger District to snowmobile use purportedly to "reduce the potential for disturbance to wolverines."

37.     While the analysis area may contain habitat suitable for lynx, lynx have never been documented in the Analysis Area. One set of Lynx tracks was observed 5 miles north of the Analysis Area, but that observation occurred more than 20 years ago. In addition, one confirmed lynx was taken 102 years ago approximately nine miles southwest of the Analysis Area. Consequently, the EA concluded that "the probability of occurrence of lynx [in the Analysis Area] is considered low."

38.     Despite the practically non-existent possibility of lynx even occurring in the Analysis Area, the EA concluded that Alternative 4 "would increase potential disturbance to lynx from over-snow recreation and the potential for mortality as a result of incidental trapping."

39.     The Decision relied on the EA's analysis and arbitrarily and capriciously concluded that adopting Alternative 4 would endanger "predicted" prime lynx habitat in the Fairfield Ranger District, even though not one lynx has ever been observed in the District.

40. District Ranger Dettori published a draft of the Decision on August 30, 2018 and provided legal notice of opportunity to object on August 31, 2018.

41. ISSA timely filed its objection to the draft Decision on October 15, 2018, raising the arguments recited herein. On December 10, 2018, Forest Supervisor DeMaagd responded by letter to ISSA's objections and rejected them.

42. District Ranger Dettori signed the Decision on December 18, 2018.

## COUNT ONE
## Violation of the Administrative Procedure Act

43. ISSA incorporates by reference each of the preceding paragraphs as if fully set forth herein.

44. Rejecting Alternative 4 based on unsubstantiated risks to "wintering mountain goats, lynx, and wolverine denning" was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under 5 U.S.C. § 706(2).

45. ISSA has exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

46. ISSA has suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Fairfield Ranger District as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT TWO
## Violation of NEPA – Failure to Rely on High-Quality Scientific Evidence

47. ISSA incorporates by reference each of the preceding paragraphs as if fully set forth herein.

48. Under NEPA, the EA may only rely on high quality scientific evidence in conducting its analysis.

COMPLAINT - 10
4833-4773-5947v1

49. The EA failed to cite high quality scientific evidence to support its conclusions that Alternative 4 would have a negative impact on wintering mountain goats, lynx, and wolverines.

50. The violation of NEPA is arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law. 5 U.S.C. § 706(2).

51. ISSA has exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

52. ISSA has suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Fairfield Ranger District as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT THREE
### Violation of the National Forest Management Act

53. ISSA incorporates by reference each of the preceding paragraphs as if fully set forth herein.

54. The National Forest Management Act (NFMA) establishes the statutory framework for management of the National Forest System. 16 U.S.C. §§ 1600 et seq. The NFMA requires the Forest Service to develop a Land and Resource Management Plan for each National Forest, including the Sawtooth National Forest. 16 U.S.C. § 1604. Pursuant to the NFMA, the Decision must be consistent with the Forest Plan. 16 U.S.C. § 1604(i).

55. The Forest Plan's Desired Condition for Recreation Resources includes "primitive settings where there are opportunities for solitude, risk, and challenge," "management of dispersed activities," and "dispersed recreation sites."

56. One of the Goals of the Forest Plan is to "[p]rovide an array of winter recreation experiences, while mitigating conflicts between motorized and non-motorized use and wintering wildlife."

57. The Objectives of the Forest Plan include "[p]rovid[ing] networks of marked and designated snow machine . . . winter travel routes and trailhead facilities, while meeting other resource goals and objectives," and "[p]rovid[ing] opportunities for backcountry winter recreation in areas without wintering wildlife conflicts."

58. Contrary to the Forest Plan and without any reliable scientific evidence that Alternative 4 would endanger or harm wintering wildlife, the Decision concentrates snowmobile use in the open, low-lying, and relatively low-snow area of the Fairfield Ranger District, eliminating a unique, high-elevation, high-volume snow experience that exists nowhere else in the Forest.

59. The violation of the NFMA is arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law. 5 U.S.C. § 706(2).

60. ISSA has exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

61. ISSA has suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Fairfield Ranger District as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## ATTORNEY'S FEES AND COSTS

62. ISSA has been required to retain the services of Parsons Behle & Latimer in order to bring the allegations herein. ISSA is entitled to recover its reasonable attorney's fees and costs of suit pursuant to the Equal Access to Justice Act, 28 U.S.C. § 241 *et seq.*, Federal Rule of Civil Procedure 54, and any other applicable rule or statute.

## PRAYER FOR RELIEF

WHEREFORE, ISSA prays for entry of judgment against Defendants, as follows:

1. Enter judgment in favor of ISSA on all claims for relief raised in the Complaint;

2. Declare unlawful and set aside the Decision;

3. Remand the applicable matters inadequately addressed in the Decision for further analysis and action in accordance with applicable law;

4. Award ISSA its costs, including reasonable attorney's fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 241 *et seq.*, Federal Rule of Civil Procedure 54, and any other applicable rule or statute;

5. For such other and further relief as the Court deems just and proper.

DATED THIS 29th day of May, 2019.

                PARSONS BEHLE & LATIMER


                By */s/ Norman M. Semanko*
                   Norman M. Semanko
                   Bryce C. Jensen
                Attorneys for Plaintiff
                Idaho State Snowmobile Association