Lauren M. Rule (ISB #6863)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
lrule@advocateswest.org

Attorney for Defendant-Intervenors

Marla S. Fox (OSB #141648), *pro hac vice*
PO Box 13086
Portland OR 97213
(651) 434-7737
mfox@wildearthguardians.org

Attorney for Defendant-Intervenor WildEarth Guardians


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO STATE SNOWMOBILE ASSOCIATION, | Case No. 1:19-cv-00195-DCN |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| U.S. FOREST SERVICE; THE SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, in his capacity as Acting Forest Supervisor for the Sawtooth National Forest; and MIKE DETTORI, in his capacity as District Ranger for the Fairfield Ranger District, | |
| Defendants, | |
| and | |
| WILDEARTH GUARDIANS and WINTER WILDLANDS ALLIANCE, | |
| Defendant-Intervenors. | |

## INTRODUCTION

This Court should deny Plaintiff Idaho State Snowmobile Association's ("ISSA") motion for summary judgment challenging Defendant U.S. Forest Service's winter travel plan for the Fairfield Ranger District.  First, ISSA waived its claim that the Forest Service should have prepared an Environmental Impact Statement ("EIS") for the plan because ISSA failed to include that claim in its complaint.  Second, regardless of that procedural error, ISSA's arguments that the Forest Service violated the National Environmental Policy Act ("NEPA"), Administrative Procedure Act ("APA"), and National Forest Management Act ("NFMA") in its decision-making process for the Fairfield winter travel plan are belied by the evidence in the administrative record showing the agency carefully considered the available facts and science and made a well-reasoned decision.

ISSA claims that the Forest Service's decision to close part of the ranger district to snowmobile use to protect mountain goat, wolverine, and Canada lynx habitat was not supported by science, and instead the agency should have opened the entire area to snowmobiles.  ISSA's arguments ignore basic tenets of NEPA and the APA:  the Forest Service must consider and disclose the relevant science and its shortcomings, but has wide discretion when assessing that science and may rely on the reasonable opinions of its own experts.  Here, the Forest Service weighed comments from the snowmobile community as well as wildlife advocates, considered relevant scientific studies and expert opinions, took into account requirements under the Sawtooth Forest Plan and Forest Service Travel Management Rule, and followed its multiple-use mandate by increasing snowmobile access to a large portion of the ranger district while protecting important winter wildlife habitat.  Although ISSA may not be happy with the result, and in fact Defendant-Intervenors would have preferred greater protections for wildlife, the

Forest Service made a rationale decision that complied with NEPA, NFMA, and the APA.

Nothing more was required of the agency and therefore this Court should deny ISSA's motion

for summary judgment and grant Defendant-Intervenors' cross motion.

## FACTUAL BACKGROUND[1]

### I.    Early Stages of Planning

The Fairfield winter travel plan was not a decision that the Forest Service rushed into;

indeed the agency began discussing proposals fifteen years before making its final decision and

engaged snowmobile groups right from the start.  *See* AR 1-3 (first discussing proposal in 2004),

48-54 (field trip with snowmobile groups in January 2005).   At the time, an area in the middle of

the Fairfield Ranger District was closed to snowmobile use to protect elk winter habitat, which

prevented most snowmobile access to the northern half of the district.  AR 1-3.  The only

snowmobile use north of the elk closure was by landowners who had permits to go through the

closure to access their private inholdings, and a few highly skilled snowmobilers who came

down from the Sawtooth Ranger District.  *Id.*  Based on repeated requests by the snowmobiling

community, the Forest Service decided to consider opening a public snowmobile corridor

through the elk closure to allow public access to the northern portion of the district.  AR 67

After a delay of several years, the Forest Service issued a project initiation letter in 2009

and began developing alternative actions to analyze.  AR 67, 71-78, 111-14, 117-20.   The inter-

disciplinary team tasked with conducting the analysis included representatives from Idaho

Department of Fish and Game ("IDFG") and Idaho Department of Parks and Recreation

("IDPR").  AR 102.  The Forest Service formed two sub-groups to assess the key issues and

recommend alternative actions—a sub-group of wildlife biologists and a sub-group of recreation

---

[1] As the other parties have done, Defendant-Intervenors cite to the Administrative Record ("AR") in their brief rather than provide a separate statement of facts.

specialists.  AR 111-12.  The wildlife sub-group focused on impacts to mountain goats, wolverine, elk, Canada lynx, and wolves from increased snowmobile use in the northern portion of the district, and developed an alternative action that was based on protecting mountain goat winter habitat and wolverine denning habitat.  AR 72-73, 104-08.  Notably, this alternative was "not necessarily IDFGs preferred alternative based solely on wildlife needs."  AR 108 (emphasis in original).  The recreation sub-group looked at current snowmobile use and where riders desired to ride if they were allowed access, and suggested their own alternative.  AR 111.

The inter-disciplinary team developed four initial alternative actions: (1) a no action alternative; (2) an alternative that would provide a motorized trail through the current elk closure area to allow public access to the northern portion of the ranger district but close the headwaters of the South Fork Boise River to protect mountain goats and wolverine; (3) an alternative that would close the entire northern portion of the district to all snowmobile use (including use by the private landowners); and (4) an alternative that would provide a motorized trail through the current elk closure and open the entire northern portion of the district to snowmobiles.   AR 118-19.  The Forest Service held two scoping periods in 2010 and 2011 to solicit public comment on its proposed action and alternatives.  AR 698, 1078.  It received numerous public comments, including from IDFG, ISSA, Winter Wildlands Alliance and its partners The Wilderness Society and Idaho Conservation League ("WWA/TWS/ICL"), and many individual members of the public.  AR 1039-42, 1188-90 (IDFG), 1093-97 (ISSA), 1052-75, 1197-215 (WWA/TWS/ICL), 716-1077 (261 total comments on scoping notice #1), 1085-222 (78 total comments on scoping notice #2).  The comments included a range of topics, including private landowner access, wildlife, recreation, and enforcement.  AR 1086-88.

The agency then put the project on hold for two years to allow scientists to collect

information during a study assessing winter recreation impacts on wolverine, and to wait for a court decision in a case Winter Wildlands Alliance brought that could result in additional requirements for Forest Service winter travel planning.  AR 132-33, 1224.  Once the wolverine-winter recreation study moved to a new area and the court case was decided (requiring the Forest Service to issue a new travel management rule that included winter travel planning), the Forest Service resumed the Fairfield project.  *Id.*  In its first notice of proposed action, issued in December 2013, the agency stated that it received requests from snowmobilers annually to open a trail through the elk winter closure to access the northern portion of the district.  AR 1225.  It laid out the same four alternatives described in the second scoping notice, and identified wildlife and winter recreation opportunities as the two key issues to analyze.  AR 1226-28, 1231-32.  The agency accepted public comments and received twenty-one responses, with snowmobile proponents pushing for the alternative allowing the most access and wildlife proponents favoring the alternative most protective of wildlife.  AR 1236-52.

As the Forest Service continued to analyze relevant information and science and assess public comments, it decided to consider an additional alternative action and sought feedback from IDFG biologists.  AR 290-91.  In a June 2015 meeting with IDFG, the Forest Service explained that the new alternative would shrink the elk closure area, removing the eastern part of the closure entirely (rather than having a motorized corridor go through it), based on changes in elk winter distribution showing use only in the western part of the closure area.  AR 290.  This would "open up a fair amount of area for snowmobiling" both within the existing closure area and beyond it.  *Id.*  However, opening the eastern part of the existing closure would potentially allow snowmobiles to access the upper Big Smoky drainage.  *Id.*  Therefore, the new alternative would close the headwaters of Big Smoky Creek in addition to the headwaters of the South Fork

Boise River to protect mountain goat, wolverine denning, and lynx habitat.  *Id.*  IDFG biologists supported this new alternative, "[p]articularly extending the closure to include all mountain goat habitat across the north end of the District."  AR 291.

After this positive feedback from IDFG, the Forest Service issued a new notice of proposed action in August 2015 that included the new alternative as the proposed action.  AR 1323, 1326-27.  This second notice of proposed action stated that IDFG winter flight data from 2015 confirmed a shift in elk wintering patterns and elk numbers meeting management goals, supporting opening the eastern part of the closure to snowmobile use.  AR 1325.  The notice also stated that the Forest Service's analysis would comply with the Forest Service's new travel management rule, which required that designations of areas and trails open to snowmobile use must meet criteria to minimize impacts to resources, harassment of wildlife, and conflicts with other recreation users.  *Id.* (citing 36 C.F.R. § 212.55(b)).

The four alternatives now being considered were developed based on Forest Plan requirements, public comments, current information on wildlife presence and habitat, and issues related to the landowner permit system.  AR 1325-26.  These alternatives consisted of: (1) the no action alternative, (2) the proposed action of removing the eastern part of the elk closure area and extending the new wildlife closure area to include the headwaters of Big Smoky drainage, (3) the "enhanced wildlife protection" alternative of closing the entire north half of the district to snowmobile use, and (4) the "maximize motorized recreation" alternative of allowing snowmobile use everywhere except the western part of the elk closure area.  AR 1326-29.  The Forest Service again solicited public comments and received sixty-eight responses supporting various alternatives, with some claiming the science does not support any closures to protect wildlife and others claiming the science supports closing the entire north half of the district to

snowmobile use.  AR 1495-501.

## II.   Specialist Reports

As the Forest Service's planning process progressed, the agency completed various specialist reports and compliance checks, including a wildlife specialist report and a recreation specialist report.  The wildlife specialist report discussed impacts of the four alternatives on various species, with extensive analysis on elk, mountain goats, Canada lynx, and wolverine. AR 310-67.  For these four species, the report included information such as population status, maps of observed locations and winter habitat, science about habitat use and impacts of disturbance, and Forest Plan direction that applies to the species.  AR 311-46.  It then assessed the effects of each alternative action on each species, as well as cumulative effects with other actions, and whether the alternative was consistent with Forest Plan direction.  *Id.*

For elk, the report showed that between 2000 and 2015, most winter use had shifted to the west and south, with the report speculating that wolf predation might be the cause of the shift.  AR 313-14.  The report stated that the proposed action would likely inhibit elk from wintering in the eastern part of the current closure area in the future and therefore monitoring would be used to determine if elk wintering patterns change again and snowmobile disturbance becomes an issue.  AR 315.

Regarding mountain goats, the wildlife report contained population counts on the Fairfield Ranger District during winter aerial surveys from 1981 to 2009, as well as a map of wintertime habitat and observed goat locations in 2001, 2004, and 2008-2009.  AR 317-18.  It discussed science on habitat use and impacts of disturbance, noting that more literature exists on the effects from helicopter use than from snowmobile use, but that both can affect mountain goat behavior—especially when the disturbance is sudden and unpredictable.  AR 319, 324 (citing

literature).  The report pointed out that much of the area on the north end of the ranger district is closed or highly restricted for helicopter skiing out of concern for mountain goats.  AR 319.

When assessing the proposed action, the wildlife report stated that it was developed to maximize winter mountain goat protection, and that it would allow snowmobiles to travel outside of areas where disturbance to mountain goats would be expected.  AR 321.  A map of the final proposed action shows the wildlife closure encompassing all of the goat locations and most winter habitat.  AR 322.  The report stated that this alternative would meet Forest Plan direction for mountain goats.  AR 321.  In contrast, under the maximum motorized recreation alternative, mountain goats would be "at increased risk from disturbance and displacement" due to the potential for snowmobiles to access areas in proximity of mountain goat winter habitat, particularly in light of advances in snowmobile technology that allow them to access more areas.  AR 324.  The wildlife report concluded that the maximum motorized recreation alternative is unlikely to meet Forest Plan direction for mountain goats, specifically Objectives 640 and 834 and Standards 667 and 867.  *Id.*

The report's section on Canada lynx contained a discussion about Lynx Analysis Units ("LAUs") and maps showing the six units and foraging and denning habitat in the analysis area.  AR 325, 327, 330.  It described lynx habitat use and potential impacts from snowmobiles, including disturbance and access for trappers.  AR 326.  The report acknowledged no recent observations of lynx on the ranger district and a low probability of lynx occurring in the analysis area.  AR 327.  However, the most likely area in which they might occur would be the two LAUs on the northern end of the district based on historical lynx sightings, potential habitat, and remoteness of the area, making those two LAUs the most important in the analysis area.  AR 327, 329.  The proposed action would close those two units to snowmobile use, and would meet

Forest Plan direction.  AR 329, 331.  The maximum motorized recreation alternative would allow snowmobiles in all LAUs, increasing the chance of lynx disturbance and incidental trapping, and therefore was unlikely to meet all Forest Plan direction for lynx.  AR 331-32.

Finally, the wildlife report contained information on wolverine.  AR 334-37.  It discussed the large home ranges of wolverine and their habitat use, as well as female sensitivity to disturbance during denning.  AR 334.  It noted a past study in central Idaho documenting a female wolverine moving her kits to a different site when humans and their tracks occurred near an existing den.  *Id.*  This disturbance when females are lactating and feeding their kits is very detrimental.  *Id.*  Preliminary results from the ongoing wolverine-winter recreation study indicated that, while wolverine seem to tolerate winter recreation within their home ranges, high levels of recreation influenced female movements and caused avoidance of the recreated areas. AR 335-37.  Den sites were located in areas that did not have snowmobile use.  AR 337.

Both studies and other credible sightings documented wolverine locations throughout the analysis area, as shown in the wildlife report.  AR 334-36.  Although no dens were found in the analysis area during the wolverine-winter recreation study, biologists expect that up to two dens may occur based on the number of wolverine observations throughout the analysis area and information from a hunting outfitter.  AR 335, 341.  In fact, a den was documented just ¼ mile west of the analysis area in 2008, with the female spending a good portion of the denning period within the analysis area.  *Id*.  The report's map also showed the prime wolverine denning habitat in and adjacent to the analysis area.  AR 336.

The wildlife report explained that the proposed action would protect 58% of the potential wolverine denning habitat in the analysis area and 48% across the entire district, including the most important denning habitat based on remoteness of the area, lack of existing disturbance, and

connectivity to habitat and populations to the north.  AR 339.  The remaining 42% of predicted

wolverine denning habitat in the analysis area would likely see an increase in snowmobile use,

but those areas already receive some use and thus are less likely to contain dens. AR 341.  The

potential for incidental trapping of wolverine would also increase in the areas open to

snowmobiles due to more access by trappers.  AR 341.  The report concluded that the proposed

action would meet Forest Plan direction for wolverine, specifically Objectives 640 and 834 and

Standards 667 and 867.  AR 341-42.  Under the maximum motorized recreation alternative, none

of the potential wolverine denning habitat in the analysis area would be protected, making it

unlikely that Forest Plan direction related to wolverine would be met.  AR 344, 345-46.

To analyze the other key issue for the plan, the Forest Service prepared a recreation

specialist report, which described the current winter recreation use occurring in the analysis area.

AR 544-50.  It stated that non-motorized recreation was extremely rare in the northern part of the

district due to the distance from plowed roads, and snowmobile use was primarily along certain

Forest routes and in certain drainages.  AR 548.  On rare occasions a few snowmobilers access

the analysis area from the adjacent Sawtooth National Recreation Area.  AR 548-49.  The report

stated that, "while 199,591 acres are legally open to over-snow vehicle travel in the analysis area,

none of this acreage is accessible to the general public without a landowner permit," except for a

very few expert snowmobilers who enter from adjacent ranger districts.  AR 550.  Under the no

action alternative, all 224,259 acres of the analysis area would remain inaccessible to most of the

general public while the proposed action would allow public access to 138,993 acres—62% of

the analysis area.  AR 555-56, 559.  Alternative 3 would close the entire analysis area to

snowmobile use, while Alternative 4 would provide public access to 211,440 acres—94% of the

analysis area.  AR 557-59.  The recreation report stated that the proposed action would meet

Forest Plan direction related to recreation, but alternatives 3 and 4 were unlikely to meet all

direction.  AR 556-58.

 In addition to assessing compliance with the Sawtooth Forest Plan, the agency had to

ensure that its new winter travel plan complied with the revised travel management rule and its

minimization criteria.  AR 382; 36 C.F.R. § 212.55(b).  One of these criteria is to minimize

harassment of wildlife and significant disruption of wildlife habitats when designating areas and

trails for snowmobile use.  AR 382.  The Forest Service assessed compliance with this criteria by

looking at the Forest Plan direction for wildlife, and stated that alternatives 1, 2, and 3 were

consistent with that direction while alternative 4 was unlikely to meet direction for mountain

goats, lynx, or wolverine.  AR 384.

### III.   EA and Decision Documents

On February 6, 2017, the Forest Service issued a draft environmental assessment ("EA")

and notice of opportunity for public comment.  AR 1502.  The EA stated that the proposed action

was an attempt to strike a balance between providing increased public access and snowmobile

recreation in the upper South Fork Boise River area while also protecting wintering wildlife.  AR

428.  It noted the district has received many requests from snowmobilers to allow access to the

northern portion of the district, and the proposed action would minimize potential disturbance to

wintering mountain goats, lynx, and wolverine denning from the likely increase in snowmobile

use once that area is accessible.  AR 433, 435.  The EA contained the same four alternative

actions as in the 2015 notice of proposed action.  AR 439-47.

The discussion on effects to wildlife and recreation were substantially similar to the

specialist reports, disclosing the same data and literature and reaching the same conclusions

about effects and Forest Plan compliance for each alternative.  AR 453-507.  The EA added

information about the legal status of wolverine that was not provided in the wildlife report, namely that the species is currently proposed for listing as threatened under the ESA, is a Region 4 Forest Service sensitive species, is a species of "Special Concern" in Canada, and a "Species of Greatest Conservation Need" in the State of Idaho.  AR 476-77.  It also noted the wolverine-winter recreation study was planned to be completed by the end of 2017.  AR 479.  The EA identified biologists from IDFG whom the Forest Service consulted during development of the EA and listed numerous scientific references.  AR 508-13.

The Forest Service received thirty-three comment letters on the EA, including from IDFG, ISSA, WWA/TWS/ICL, and WildEarth Guardians.  AR 1506-47.  IDFG comments noted that its staff were involved in the analysis process, including through wildlife data collection and dissemination and written technical input.  AR 1514 attachment letter p.1.[2]  The comment letter discussed the recent data showing winter elk distribution had changed, as well as more information related to mountain goats and support for the proposed action.  *Id.* p. 2.  Letters from WWA/TWS/ICL and WildEarth Guardians also discussed impacts from snowmobile use to wildlife, and argued that the proposed action was not sufficient to protect lynx, mountain goats, and wolverine due to habitat in areas outside the new closure that could experience increased snowmobile use.  AR 1515 attachment letter pp. 3-5; AR 1529 attachment letter pp. 4-9.  In contrast, ISSA's comments argued that existing science did not support the need for any snowmobile closure area to protect mountain goats, lynx, or wolverine.  AR 1541-47.  The Forest Service's response to public comments addressed these points, providing further information and explanation to support its decision.  AR 1548-64.

---

[2] Comment letters from IDFG, Winter Wildlands Alliance and WildEarth Guardians can be viewed by going to the AR cite that has the cover email, and then clicking on the links for the attachments in the header of the email.

After the Forest Service issued the EA, IDFG conducted a survey of mountain goats in

March 2017, which showed an increase in population size in Hunt Area 43 since 2009 (the EA

analysis area is within Hunt Area 43).  AR 526-34.  A map of the 2017 locations showed

mountain goats using the western and eastern portions of the proposed action wildlife closure,

with all locations within the mapped winter habitat.  AR 628.  Two additional locations occurred

just south of the proposed action closure on the east side of the Fairfield Ranger District, and

more locations were to the north and east of the district.  *Id.*  In addition, the wolverine-winter

recreation study was completed in December 2017 and a final report issued.  AR 10455-533.

The Executive Summary of the report stated that wolverines responded negatively to increasing

intensity of winter recreation, and females exhibited strong avoidance of off-road motorized

recreation.  AR 10461.  It noted that negative responses to dispersed motorized recreation

increased with increasing levels of recreation within a wolverine home range, which could result

in habitat loss from displacement.  *Id.*  The study results suggested that significant habitat

degradation to reproductive females during denning season is a concern in landscapes with

higher levels of winter recreation, and the effects of backcountry winter recreation on wolverine

may increase under climate change.  *Id.*

In September 2018, the Forest Service issued a draft Decision Notice & Finding of No

Significant Impact ("DN/FONSI") adopting the proposed action.  AR 582.  The draft DN/FONSI

responded to public concerns about wildlife, snowmobile recreation, and heli-ski operations.  AR

585-88.  When discussing wildlife concerns, it provided information from the IDFG 2017

mountain goat survey and conclusions from the 2017 final report for the wolverine-winter

recreation study, stating that both pieces of information validated the conclusions in the EA

regarding potential effects of winter recreation on those species.  AR 585-86.  After listing

numerous conclusions from the wolverine-winter recreation study, the draft DN/FONSI specifically stated that, "[t]he results of this study provide compelling evidence for securing areas free of disturbance within wolverine home ranges during the denning period." AR 586.

The draft DN/FONSI also explained why the proposed action would not have a significant effect on the environment, negating the need for an EIS. AR 588-91. It stated that, although there are opposing opinions about the proposed action, "there is no substantiated scientific controversy over the effects themselves"; and there are no highly uncertain, unique or unknown risks because "[t]he technical analyses conducted for the determination of impacts to the resources are supportable with use of accepted techniques, reliable data and professional judgment." AR 589. The draft DN/FONSI also stated that the decision was consistent with the Sawtooth Forest Plan and the travel management rule. AR 591.

The Forest Service received objections to the draft DN/FONSI from ISSA, WildEarth Guardians, and WWA/TWS. AR 604-11 (ISSA), 612-23 (WildEarth Guardians), 599-600 (WWA/TWS). ISSA claimed that the science did not support the need for a snowmobile closure area to protect wintering wildlife. AR 606-09. The Forest Service held objection resolution meetings and responded in writing to each objection with additional rationale for its decision. AR 624, 626, 629-31, 660-63, 664-69, 670-71. The Forest Service specifically noted that it used the best available science in its decision-making. AR 661, 667.

The Forest Service signed the Final DN/FONSI on December 18, 2018. AR 688. It was substantially similar to the draft DN/FONSI and selected the proposed action as the final decision. AR 676. It stated that the selected action "makes an attempt to strike a balance between providing over-snow vehicle access while offering some protection for wintering wildlife" and "best responds to all the issues." AR 680. Like the draft, the final DN/FONSI

concluded that there would be no significant effects so no EIS was needed, and the selected action would comply with the Sawtooth Forest Plan and the Forest Service travel management rule.  AR 683-86.

## ARGUMENT

The administrative record makes clear that, while neither ISSA nor Defendant-Intervenors were happy with the final decision, the Forest Service considered and disclosed the relevant science, opinions of its own and IDFG wildlife biologists, and its obligations under the Forest Plan and travel management rule.  Based on the relevant information, the agency came to a rational conclusion.   Nothing further was required under the law.  Moreover, ISSA failed to plead in its complaint a claim that the Forest Service should have completed an EIS, thereby waiving that claim.  For these reasons, ISSA's NEPA, APA, and NFMA claims must fail.

### I.    ISSA WAIVED ITS EIS CLAIM.

ISSA's NEPA argument in its opening summary judgment brief focuses extensively on the Forest Service's failure to complete an EIS, but the Court should disregard this argument because ISSA did not plead that claim in its complaint.  ECF No. 23-1 at 17-22; ECF No. 1.

"Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (internal quotation omitted). A district court need not address legal theories that are based on allegations not included within a complaint.  *Pickern,* 457 F.3d at 968-69 (disregarding summary judgment argument that was not supported by allegations in complaint); *OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*, 897 F.3d 1008, 1024-25 (9th Cir. 2018) (rejecting legal claim not pled in complaint); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-94 (9th Cir. 2000) (refusing to

allow the plaintiffs to go forward with a new legal theory at summary judgment).

In a situation similar to this one, the Ninth Circuit held that plaintiffs waived one of five NEPA claims because they failed to plead it in their complaint. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079-80 (9th Cir. 2008). Plaintiffs' complaint had not included a claim about a particular NEPA violation or the factual allegations upon which the claim rested and instead they raised the claim for the first time in their motion for summary judgment. *Id.* at 1079. The Ninth Circuit stated that when a complaint does not include the necessary allegations to state a claim, raising such a claim in a summary judgment motion is insufficient to present the claim to the district court. *Id.* at 1080. Because the plaintiffs had failed to present the NEPA claim to the court by not pleading it in their complaint, they waived that particular claim. *Id.*

ISSA failed to include any allegations in its complaint stating the Forest Service should have completed an EIS. ECF No. 1 ¶¶ 11-61. Its single claim for relief under NEPA was titled "Violation of NEPA – Failure to Rely on High-Quality Scientific Evidence." *Id.* at 10. This claim alleged that the EA failed to cite high quality scientific evidence to support its conclusions. *Id.* ¶¶ 48-49. The claim did not make any allegations regarding the need for an EIS. *Id.* ¶¶ 47-52. ISSA also never mentioned the need for an EIS in any of its comments or objection to the decision. AR 1093-97, 1266-67, 1542-47, 604-11, 629-31 (comments and objection from ISSA). Therefore, ISSA failed to provide any notice to the Forest Service of this alleged NEPA violation prior to its summary judgment briefing. Omitting this legal claim from its complaint was a fatal flaw that requires the Court to disregard ISSA's EIS argument raised for the first time in its opening summary judgment brief. *Navajo Nation,* 535 F.3d at 1079-80; *OTR Wheel Eng'g, Inc.*, 897 F.3d at 1024-25.

## II.     THE FOREST SERVICE MADE A WELL-REASONED DECISION THAT COMPLIED WITH NEPA AND THE APA. [3]

The basis of ISSA's NEPA and APA arguments is that the scientific evidence in the record did not support the Forest Service's decision to close the northern part of the district to snowmobiling for protection of wintering wildlife because there was no conclusive proof that snowmobiling would injure those species.  ECF No. 23-1 at 17-25.  No such proof is required, however, because NEPA is a procedural statute—it merely requires that the agency consider and disclose the available science and then make a rational decision.  The record here demonstrates that the Forest Service met those requirements.

### A.     Agencies' Duties Under NEPA.

Federal Defendants' brief identifies an agency's basic responsibilities under NEPA and the APA when making decisions.  ECF No. 25 at 7-8, 9-10.  Defendant-Intervenors expand upon that discussion to more fully explain an agency's duties when dealing with scientific evidence, and the court's role in assessing the agency's compliance with NEPA under the APA.

As Federal Defendants noted, NEPA does not impose substantive standards with which the agency must comply.  Instead, it ensures the agency follows a process that leads to an informed decision.  ECF No. 25 at 7 (citing cases); *see also Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Defense Council,* 555 U.S. 7 (2008) ("NEPA . . . does not impose any substantive requirements on federal agencies—it exists to ensure a process." (internal quotation omitted)).  The Ninth

---

[3] As Federal Defendants aptly explained, the Court must reject ISSA's stand alone APA claim for failure to state a claim.  ECF No. 25 at 19 (citing cases rejecting such claims); *see also Eason Land Co., LLC v. Sec'y of U.S. Dep't of the Interior*, No. 2:14-cv-951-SU, 2015 WL 13661540, at *7 (D. Or. Feb. 19, 2015); *Public Lands for the People, Inc. v. U.S. Dep't of Agric.*, 733 F. Supp. 2d 1172, 1180 (E.D. Cal. 2010) (also rejecting such claims).  Therefore, Defendant-Intervenors treat ISSA's NEPA and APA arguments together and use NEPA as the underlying authority for both.

Circuit has articulated in numerous cases an agency's responsibility under NEPA when assessing scientific information and the court's role in reviewing the agency's compliance.

When conducting its NEPA analysis, an agency must identify any methodologies used, the scientific data underlying expert opinions, and other scientific sources relied upon by the agency for its conclusions. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300-01 (9th Cir. 2003)*; Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1037-38 (9th Cir. 2012). However, the fact that the science may be "uncertain" does not preclude an agency from acting under NEPA as long as the agency acknowledges the limitations in the science and provides a rational explanation for its decision despite those limitations. *Idaho Wool Growers Ass'n v. Vilsack,* 816 F.3d 1095, 1109 (9th Cir. 2016) (explanations and acknowledgements about limitations of scientific evidence are all that NEPA requires); *Lands Council,* 537 F.3d at 1001 (NEPA requires agency to acknowledge significant uncertainties in scientific evidence); *Alliance for the Wild Rockies v. U.S. Fish and Wildlife Serv.*, No. CV 04-216-M-DWM, 2006 WL 8435853, at *10-11 (D. Mont. Aug. 29, 2006) (no NEPA violation where agency revealed shortcomings of study and articulated reasonable explanation for why it relied on the information).  If NEPA demanded more, "government actions affecting the environment, positively or negatively, could be hamstrung by the need for unattainable scientific certainty." *Vilsack,* 816 F.3d at 1109.

As long as an agency fulfills its duty to disclose any limitations in the science, the court's deference to an agency's technical scientific analysis is at its peak.  *Vilsack*, 816 F.3d at 1107. An agency is entitled to "wide discretion in assessing the scientific evidence" and "courts must defer to the informed discretion of the responsible federal agencies."  *Earth Island*, 351 F.3d at 1301.  Furthermore, an agency must have discretion to rely on the reasonable opinions of its own

experts, and use the studies and methodologies it deems reliable.  *Id.; Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051-55 (9th Cir. 2012).  "When the agency's determination is founded on reasonable inferences from scientific data, a reviewing court will not substitute its judgment for that of the agency."  *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016) (internal quotation omitted).  In sum, if the agency considers the available scientific data and literature, as well as the opinions of its experts, courts will defer to the agency's reasonable evaluation of that information and resulting conclusions.  *Id.* at 583-84.

These same standards apply in the context of travel planning, where the agency must comply with NEPA as well as its travel management rule, which requires that snowmobile designations minimize damage to resources, harassment of wildlife, and conflicts with other recreation users.  *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 930-32 (9th Cir. 2015).   When an agency considers the best available science, discloses its methodology and scientific sources, and makes a reasoned decision, courts defer to that decision.  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782-84 (10th Cir. 2006) (upholding agency determination to restrict snowmobiling in lynx habitat despite uncertainty about impacts to species); *Bitterroot Ridge Runners Snowmobile Club v. U.S. Forest Serv.*, 329 F. Supp. 3d 1191, 1200-01 (D. Mont. 2018) (no NEPA violation where snowmobile restrictions were supported by the available information); *Clearwater Cnty., Idaho v. U.S. Forest Serv.*, No. 1:13-cv-519-EJL, 2017 WL 2623166, at *13-15 (D. Idaho June 16, 2017) (upholding travel plan where agency examined the existing data and provided satisfactory explanation for decision).

The primary case ISSA relies on for its argument about lack of evidence showing harm to species is inapposite because it involved the ESA, which has substantive standards that demand an agency avoid harming a threatened or endangered species.  ECF NO. 23-1 at 22-24 (citing

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001)); 16

U.S.C. § 1538.  NEPA has no such substantive standards and therefore *Arizona Cattle Growers*

has no relevance here.  Indeed, snowmobile plaintiffs relied on that same case in a NEPA

challenge to a winter travel plan in Colorado and the Tenth Circuit rejected their argument,

stating that *Arizona Cattle Growers* involved "specific provisions of the ESA which have no

application to this case."  *Silverton Snowmobile Club*, 433 F.3d at 784.

B.     **The Record Shows the Forest Service Adequately Considered and Disclosed
       Scientific Evidence and Provided a Reasoned Explanation for its Decision.**

As demonstrated in the Factual Background above, the Forest Service fulfilled its NEPA

duties of public disclosure and informed decision-making.  Over the course of the planning

process, the agency took into consideration the available science—incorporating new science as

it arose—and solicited public participation during numerous phases of the process.  The Forest

Service considered alternative actions that offered maximum snowmobile use and maximum

wildlife protection, but it selected the alternative that it believed best met the Forest Plan and

travel management rule requirements by substantially increasing snowmobile access to the

northern part of the ranger district while also protecting important winter wildlife habitat.  The

administrative record supports that decision.

ISSA claims that lack of proof about harm to wildlife should negate the Forest Service's

decision but, as explained above, scientific certainty is not required under NEPA.  Indeed, if such

certainty was required, the Forest Service should not have opened the eastern half of the elk

closure to snowmobile use when it was not certain what caused the elk to shift their winter

distribution or whether they might shift back.  AR 290, 314-15, 1325 (discussing new proposed

action); AR 667, 1561 (recognizing uncertainty in reason for elk shifting distribution in agency's

response to public comments).  The Forest Service had discretion to make this decision after it

DEFENDANT-INTERVENORS' SUMMARY JUDGMENT BRIEF                                    19

considered the available data, weighed the opinions of experts, and responded to public concerns. *Earth Island*, 351 F.3d at 1301; *Native Ecosystem Council*, 697 at 1051-56; *Protect Our Communities Found.*, 825 F.3d at 583-84.  This same standard applies to the Forest Service's wildlife closure, which the agency met by considering the available information and expert opinions, disclosing the limitations in the science, and explaining its decision.

    Mountain Goats

    With regard to mountain goats, the Forest Service considered IDFG survey and population data, including from the most recent survey in 2017, and winter habitat on the Fairfield Ranger District.  AR 317-18, 459-61, 628.  It discussed and cited scientific literature related to mountain goat habitat use and disturbance impacts.  AR 319, 324, 461-62, 467.  The agency recognized that "[t]here is considerably more literature on the effects of helicopter use on wintering mountain goats . . . than there is on over-snow vehicle effects on mountain goats," but that both "can affect mountain goat behavior, depending upon the proximity and duration of the disturbance."  AR 319, 462 (citations omitted).  It also acknowledged that generally there is segregation between snowmobiles and wintering mountain goats, but the interspersion of mountain goat wintering habitat and areas of deeper snow sought after by snowmobilers creates a potential for interaction.  *Id.*  And while mountain goats may become habituated to predictable, continuous noise, they are disturbed by sudden, unpredictable stimuli.  *Id.*

    The Forest Service's wildlife expert concluded that the proposed action would meet Forest Plan direction for mountain goats but the maximum winter recreation use alternative was unlikely to do so.  AR 321, 324-25, 464, 467-68.  Without the closure area, "it is foreseeable that wintering mountain goats would be at increased risk from disturbance and displacement as a result of over-snow vehicle recreation.  Technology is permitting over-snow vehicles to access

areas previously not possible, and this trend is expected to continue." AR 324, 467. Although

mountain goat winter habitat is generally not used by snowmobiles, "the proximity with which

over-snow vehicles can go to these habitats puts mountain goats at risk from disturbance." *Id.*

IDFG biologists likewise supported the closure area to protect wintering mountain goats,

as the Forest Service noted in its final decision. AR 291, 680, 1514. In their comments on the

EA, IDFG stated:

> As discussed in the EA, mountain goats are generally considered to be highly intolerant of human activity. During 2009 aerial surveys for mountain goats, anecdotal observations suggested that goats were absent from areas where substantial recent ski or snowmobile activity was documented (indicated by recent ski and snowmobile tracks). Similar basins or ridges with no ski or snowmobile activity commonly had goats or goat tracks. These observations combined with research support the premise that goats react negatively to human activity, particularly when the activity is sudden or unpredictable. We appreciate the proposed over-snow vehicle closure area that now encompasses the upper Big Smoky and West Fork Big Smoky drainages; areas where we commonly observe the highest densities of wintering goats.

AR 1514 attachment p. 2. The Forest Service reasonably relied on the opinions of experts as

well as the available data and literature for its decision, as it explained in its response to

comments from the pubic and ISSA. AR 661-62, 1548-50, 1560.

Wolverine

A similar analysis occurred for wolverine. The Forest Service actually delayed the winter

travel planning process for two years, in part to wait for more data collection in the wolverine-

winter recreation study. AR 132-33, 1224. As the planning process progressed, the Forest

Service incorporated the most recent data from that study, ultimately including findings from the

study's final report in the DN/FONSI. AR 681. Based on this study, a prior study from central

Idaho, other wolverine observations, and scientific literature, the Forest Service discussed

wolverine use of the area and potential impacts from snowmobiles. AR 334-37, 476-80. For

instance, the agency described and depicted wolverine locations in the analysis area as well as a

known den location just west of the area.  AR 334-36, 477-79.  The Forest Service's wildlife

expert stated that, "[w]hile no wolverine dens were discovered directly on the Fairfield Ranger

District during these studies, based on the number of wolverine observations throughout the

analysis area, it is expected that potentially up to two dens may occur."  AR 335, 477-79.  He

mapped wolverine denning habitat on the district based on information from studies, professional

judgment and his knowledge of the analysis area.  AR 335-36, 478-79.

The Forest Service discussed disturbance impacts to wolverines based on findings from

the two central Idaho studies.  AR 334-37, 477-79.  It noted that disturbance to females during

denning (mid-February through May) is very detrimental, and females appear to avoid areas with

higher levels of winter recreation or increase their movement rates and timing to avoid the use,

which causes them to expend more energy.  *Id.*  The DN/FONSI included conclusions from the

wolverine-winter recreation study final report, which "validated" the conclusions in the EA

regarding potential effects from winter recreation on wolverines, particularly denning

wolverines.  AR 479, 681.  The DN/FONSI stated that," [t]he results of this study provide

compelling evidence for securing areas free of disturbance within wolverine home ranges during

the denning period.  Both dispersed motorized and non-motorized recreation can result in

indirect habitat loss for wolverines, but within the analysis area very little non-motorized

recreation occurs due to remoteness."  AR 681.

The Forest Service wildlife expert explained that the proposed action would protect 58%

of wolverine denning habitat in the analysis area, which was the most important habitat based on

remoteness of the area, lack of existing disturbance, and connectivity to habitat and populations

to the north. AR 339, 482.  The remaining 42% of denning habitat would likely see an increase

in snowmobile use but those areas already experienced some use so were less likely to contain

dens.  AR 341, 482.  He concluded that, by protecting the most important habitat, the proposed

action would meet Forest Plan direction for wolverine whereas the maximum winter recreation

use alternative likely would not.  AR 341-42, 344, 346, 484, 485, 488.  The Forest Service

further explained its decision in the response to public comments.  AR 1551, 1557, 1559.  The

Forest Service reasonably relied on the best available science regarding the effects of

snowmobiles on wolverines, wolverine observations, and wolverine denning habitat in the

analysis area, as well as the professional opinion of its own expert, to support its decision.

Canada lynx

 Finally, the Forest Service admitted that no recent observations of lynx have been

documented on the district and the probability of lynx occurring in the analysis area is low.  AR

327, 469.  However, the area contains all or parts of six LAUs.  AR 326-27, 469-70.  Impacts

from snowmobiles to lynx include compaction of snow that could allow for intrusion of

competing predators, disturbance of lynx, and increased access for trappers.  AR 326, 469.  The

Forest Service's expert opined that the two most northern LAUs in the analysis area had the

highest chance of a lynx occurrence based on past lynx populations to the north, the presence of

potential habitat, and the relative remoteness of the north end of the analysis area.  AR 327, 469.

Although the proposed action would allow increased snowmobile use in four of the

LAUs, it would protect the two LAUs considered to be the most important and therefore would

meet Forest Plan direction. AR 329-31, 471-74.  In contrast, allowing increased snowmobile use

throughout the entire analysis area was unlikely to meet all Forest Plan direction.  AR 332, 334,

475, 476.  Again, the Forest Service considered and responded to public comments concerning

impacts to lynx to help explain its decision.  AR 661, 1550, 1556.

With regard to each of these species, the Forest Service considered site-specific studies and data, which included up-to-date information on mountain goats and wolverine.  AR 628, 10455-533.  It also reviewed numerous scientific articles relevant to its analysis.  *See* AR 454-88. The agency's wildlife expert relied on this information and his own professional judgment to reach his conclusions, all of which was disclosed and explained in the wildlife report and EA. AR 317-46, 454-88.  Nothing more is required under NEPA.  Contrary to ISSA's assertions, NEPA does not require scientific certainty before an agency can act.  *Vilsack,* 816 F.3d at 1109; *Lands Council,* 537 F.3d at 1001; *Silverton Snowmobile Club*, 433 F.3d at 782-84.  Because the Forest Service fulfilled its procedural duties, this Court must defer to the agency's scientific analysis and resulting decision. *Vilsack*, 816 F.3d at 1107; *Earth Island*, 351 F.3d at 1301; *Native Ecosystem Council,* 697 F.3d at 1051-55; *Protect Our Communities Found.,* 825 F.3d at 583-84.

### C.      It was not Arbitrary and Capricious to Issue a FONSI Rather than an EIS.

Finally, if the Court decides to review ISSA's EIS claim despite the omission of that claim from ISSA's complaint, the Court should reject that claim on the merits.  ISSA argues that the uncertainty about snowmobile impacts to lynx, mountain goats, and wolverine triggers the need for an EIS, but the record shows that the Forest Service's decision not to prepare an EIS was not arbitrary and capricious.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (applying arbitrary and capricious standard when reviewing decision not to prepare EIS).

As explained in *Native Ecosystems Council*, impacts are not highly uncertain merely because information favorable to ISSA's position is in the record.  *Id.* at 1240.  "Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain."  *Id.*  The court

determined that *some* conflicting information in the record about impacts to wildlife did not show the project's effects were highly uncertain. *Id.* at 1240-44; *see also Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006) (no need for EIS where analysis of effects to owl was based on historical information, not current data, because "some" uncertainty did not make effects "highly" uncertain); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1070-71 (9th Cir. 2014) (two contrary studies did not make effects highly uncertain where agency relied on other substantial science to support its conclusions); *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673-74 (9th Cir. 2019) (predictions about potential risks based on past data and reasonable assumptions did not make effects of travel plan highly uncertain.); *Central Montana Wildlands Ass'n v. Kimball,* No. CV 04-175-M-DWM, 2006 WL 6909179, at *9-10 (D. Mont. Aug. 29, 2006), *aff'd*, 308 Fed. Appx. 84 (9th Cir. 2009) (record showed agency took a hard look at effects of travel plan and isolated admissions favorable to plaintiff did not make effects highly uncertain).

Even the case relied upon by ISSA does not support its own argument because the Ninth Circuit held that the agency did *not* have to do an EIS even though the project's specific impacts on climate change were not certain and the agency was participating in other studies to help clarify those impacts. ECF No. 23-1 at 19; *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011). In contrast, effects were highly uncertain where the agency completely failed to assess the potential effects of the proposed action on numerous resources, simply stating effects were "unknown," and proposing research to understand the effects during implementation of the project. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732-33 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

Here, the Forest Service's FONSI stated:

Pertinent scientific literature has been reviewed and incorporated into the analysis process, including the recently released Final Report for the Wolverine-Winter Recreation Research Project and results from the 2017 aerial mountain goat survey conducted by Idaho Fish and Game.  The technical analyses conducted for the determination of impacts to the resources are supportable with use of accepted techniques, reliable data and professional judgment.  Issues of public concern and possible environmental effects of the selected alternative have been adequately addressed in the analysis.  Therefore, I conclude that there are no highly uncertain, unique or unknown risks.

AR 684.  This conclusion was not arbitrary and capricious.  The Forest Service thoroughly

assessed impacts to mountain goats, wolverine, and Canada lynx using up-to-date data, other

available science, and expert opinions.  AR 459-88, 680-81.  Thus, the record shows there was

substantial science to support the agency's conclusions and the fact that *some* uncertainty may

exist about the precise extent of impacts does not trigger the need for an EIS.  *Native Ecosystems*

*Council*, 428 F.3d at 1240-44; *Envtl. Prot. Info. Ctr.,* 451 F.3d at 1011; *In Def. of Animals*, 751

F.3d at 1070-71; *WildEarth Guardians*, 923 F.3d at 673-74.

### III.     THE FOREST SERVICE'S DECISION WAS CONSISTENT WITH THE SAWTOOTH FOREST PLAN.

ISSA's argument that the decision violated NFMA must fail because the Forest Service

reasonably concluded its Fairfield winter travel plan was consistent with the Sawtooth Forest

Plan, and the agency deserves deference for that determination.  ECF No. 23-1 at 26-27.

NFMA establishes a two-tiered process for forest planning.  *See generally* 16 U.S.C. §

1604; AR 9204 - 9205.  First, the Forest Service establishes forest-wide programmatic direction

in a forest plan, 16 U.S.C. § 1604(a), which is strategic in nature.  AR 8772, 9400 (forest plan

definition).  Second, "the Forest Service implements the forest plan when approving or denying

site-specific projects."  *See Native Ecosystems Council*, 697 F.3d at 1056.  Under NFMA, a site-

specific decision must be consistent with the overarching forest plan – here, the Sawtooth Forest

Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.  The Forest Service deserves substantial deference

for its reasonable interpretation and implementation of a Forest Plan. *Native Ecosystem Council*, 697 F.3d at 1056.

ISSA asserts the winter travel decision was inconsistent with four Sawtooth Forest Plan components because it failed to provide opportunities for backcountry winter recreation in areas without wintering wildlife conflicts.  ECF No. 23-1 at 26-27.   However, ISSA cherry-picks fragments of the four plan components to support its argument, improperly focusing on these in isolation.  *Id.*  Reading the plan components in full shows the decision was consistent with the plain language of each.  Specifically, Winter Recreation Goal REGO06 directs the Forest Service to "[p]rovide an array of winter recreation experiences, while mitigating conflicts between motorized and non-motorized use and wintering wildlife." AR 8910.  The Forest Service explained the decision was consistent with this goal because "[c]onflicts between motorized and non-motorized users generally do not occur in the project area" and the decision "provide[d] winter recreation opportunities while mitigating wintering wildlife concerns."  AR 372.  *See also* AR 502-503.  Indeed, the decision dramatically increased opportunities for backcountry winter recreation in areas without wintering wildlife conflicts by newly allowing public snowmobile access to 62% (138,993 acres) of the analysis area.  AR 503, 555-56, 559.

Likewise, Winter Recreation Objective REOB22 states, "[p]rovide networks of marked and designated snow machine, cross-country ski, and other winter travel routes and trailhead facilities, while meeting other resource goals and objectives," and Objective REOB24 states, "[p]rovide opportunities for backcountry winter recreation in areas without wintering wildlife conflicts."  AR 8911.  The decision was consistent with these objectives because it provided "up to 13 miles of groomed over-snow vehicle trail" as well as significantly increased opportunities for backcountry winter recreation by opening a large portion of the district to snowmobile use

where there were minimal wildlife concerns.  AR 372-373. *See also* 556, 560, 502-503.  And the

decision was consistent with the Recreation Resources Desired Condition:

> People visiting the National Forest find opportunities for a wide spectrum of
> recreation experiences. Various methods are used to manage recreation uses and
> facilities to mitigate degrading effects from recreation to other resources. Diverse
> landscapes offer a variety of settings for a wide range of activities, including
> primitive settings where there are opportunities for solitude, risk, and challenge,
> to more modified settings where there are opportunities for social interaction,
> comfort, and less risk . . . Opportunities for physically challenged recreationists
> are maintained or expanded at developed facilities and through management of
> dispersed activities. Dispersed recreation sites and uses are located and conducted
> in an environmentally responsible manner and managed to established standards.

AR 8909.  Because it provided new opportunities for backcountry winter recreation in areas

without wintering wildlife conflicts, the decision was consistent with the Forest Plan.

Furthermore, ISSA ignores the Forest Service's duty to comply with other Forest Plan

direction, including more specific Management Area objectives and standards that emphasize

providing winter habitat security for mountain goats and reproductive denning habitat security

for wolverine in the headwaters of the South Fork Boise River.  AR 9044, 9045, 9070, 9071

(Objectives 0640 and 0834, Standards 0667 and 0867).  The Forest Service determined the

proposed action would meet this direction.  AR 374, 375, 378, 379, 463-464, 481, 484.  In

contrast, it determined that allowing snowmobiles full use of the areas around the headwaters

would increase the risk of disturbance of wintering mountain goats and denning wolverine, and

therefore the maximum winter recreation use alternative was unlikely to meet the Management

Area plan direction.  AR 464-468, 485-488.

ISSA's overstatement of the Forest Plan's requirements, claiming the agency must

provide "abundant" access to backcountry snowmobilers and "convincing" or "substantial"

evidence that snowmobile use in the closure area would cause conflicts with wintering wildlife,

are not supported by the plain language of the Forest Plan.  ECF No. 23-1 at 26.  *See Citizens for*

DEFENDANT-INTERVENORS' SUMMARY JUDGMENT BRIEF                    28

*Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003) (explaining a forest plan defines "broadly the uses allowed in various forest regions [and sets] goals and limits on various uses . . . but do[es] not directly compel specific actions").  The agency conducted a rigorous assessment of available information and reasonably concluded its decision was consistent with the Sawtooth Forest Plan.  *See, e.g.*, 462-468, 470-476, 480-488, 489-492, 499-507 (analyzing consistency of alternatives with the Forest Plan); AR 368-379 (Checklist Demonstrating Compliance with Forest Plan).  Because it was not "plainly inconsistent" with the language of the Sawtooth Forest Plan, this Court should defer to the Forest Service's consistency determination. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012).  In sum, because the decision "was based on a consideration of the relevant factors" and there was no "clear error of judgment," the Forest Service's decision was not arbitrary or capricious under the APA.  *Native Ecosystem Council*, 697 F.3d at 1056 (*quoting Morongo Band of Mission Indians v. Fed. Aviation Admin*., 161 F.3d 569, 573 (9th Cir. 1998)).

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for summary judgment and grant Defendant-Intervenors' cross motion for summary judgment.

Respectfully submitted and dated this 6th day of March, 2020.


/s/Lauren M Rule
Lauren M. Rule

Attorney for Defendant-Intervenors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of March, 2020, I filed the foregoing
MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENORS' CROSS MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT electronically through the CM/ECF system, which caused the following counsel to
be served by electronic means:


Christine England
Christine.england@usdoj.gov

Norman Semanko
Nsemanko@parsonsbehle.com

Bryce Jensen
Bjensen@parsonsbehle.com


/s/Lauren M. Rule
Lauren M. Rule

Attorney for Defendant-Intervenors