UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO STATE SNOWMOBILE ASSOCIATION,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>U.S. FOREST SERVICE; THE SAWTOOTH NATIONAL FOREST; JIM DEMAAGD, in his capacity as Acting Forest Supervisor for the Sawtooth National Forest; and MIKE DETTORI, in his capacity as District Ranger for the Fairfield Ranger District,<br><br>　　　Defendants,<br>and<br><br>WILDEARTH GUARDIANS and WINTER WILDLANDS ALLIANCE,<br><br>　　　Defendant-Intervenors. | Case No. 1:19-cv-00195-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff Idaho State Snowmobile Association's ("ISSA") Motion for Summary Judgment (Dkt. 23), Defendants U.S. Forest Service, Jim Demaagd, and Mike Dettori's (collectively the "Forest Service") Motion for Summary Judgment (Dkt. 26), and Defendant-Intervenors WildEarth Guardians and Winter Wildlands Alliance's (collectively "Intervenors") Motion for Summary Judgment (Dkt.

MEMORANDUM DECISION AND ORDER - 1

28).

The Court held oral argument on November 6, 2020, and took the motions under advisement. Upon review, and for the reasons outlined below, the Court finds good cause to GRANT in PART and DENY in PART the various motions.

## II. BACKGROUND

### A. Factual Background

The United States Forest Service is an agency within the United States Department of Agriculture and is charged with administering and overseeing the United States National Forest System lands—including the lands at issue in this case: the Sawtooth National Forest and the Fairfield Ranger District (a subunit of the Sawtooth National Forest).

Since 1974, the Fairfield Ranger District, in cooperation with the Idaho Department of Fish and Game, has closed certain areas of the District to over-snow vehicle ("OSV") travel during winter months to protect wintering wildlife, primarily elk. Prior to the events at issue in this case, the closure area was a relatively narrow strip of land running east to west in roughly the middle of the Fairfield Ranger District.[1] Aside from this narrow strip of land, all the public land within the Fairfield Ranger District was open to snowmobiling (and other winter recreation) during the winter, except a small portion of the southeast corner of the District which is not pertinent to this litigation. That said, the area north of the closure was difficult to access because the closure area served as a legal barrier and the surrounding terrain imposed a significant physical barrier.

---

[1] See Attachment 1.

Numerous individuals own private land north of the closure area ("private landowners"). During the winter, the only practicable way of accessing most of this private land is by traveling by snowmobile through the closure area on Forest Roads 094, 227, and 012. This passageway is known as the "Couch Summit to Fleck Summit Corridor." Even though motorized travel through the Couch Summit to Fleck Summit Corridor would ordinarily be prohibited during the winter, federal law entitles the private landowners to access their property for "reasonable use." AR 432, 672.[2] Prior to the Decision by the Forest Service at issue in this case, the private landowners could obtain permits for themselves and their guests to use snowmobiles to access their property during the winter via the Couch Summit to Fleck Summit Corridor. As a result, the private landowners and their permitted guests had essentially unimpeded access to the public lands that lie north of the closure area.

In recent years, monitoring of elk wintering patterns revealed that elk no longer use the eastern portion of the closure area. In light of these findings, numerous individuals and groups requested that the Forest Service open the Couch Summit to Fleck Summit Corridor for public winter use. The Forest Service agreed to review the situation, noting, "the recent changes in how elk are using the area, the need to address landowner and public access issues through the closure area, and the challenges of effectively managing a permit system prompted the review of OSV travel for this area." Dkt. 1, ¶ 18; Dkt. 9, ¶ 18.

---

[2] The administrative record is this case is voluminous. The Court will cite to the record as the parties have— "AR"—with appropriate pagination. The administrative record itself was lodged with the Court on a flash drive and is preserved in the Clerk's Office of the Boise Courthouse. The placeholder for this submission is Dkt. 16.

The Forest Service began planning and evaluating the acreage from the southern boundary of the closure area to the Fairfield District's northern border, i.e. the closure area and everything northward. This became known as the "Analysis Area." As part of this process, the Forest Service conducted an Environmental Assessment ("EA") and analyzed four alternative plans for accomplishing its goals.

Under Alternative 1, the then-existing closure policy would simply remain in place. AR 439.[3]

Under Alternative 2, the Forest Service would open the Couch Summit to Fleck Summit Corridor for public OSV use during the winter—thus easing access to an additional 138,993 acres of public land for use—and would authorize 13.1 miles of new groomed snowmobile trail on the existing Forest Service roads. AR 441–43. However, under this alternative, the Forest Service would also close 72,447 acres of public land in the northern portion of the Fairfield Ranger District to OSV use (the "New Proposed Closure" area). AR 441–43, 503.[4] The additional closure was based on the Forest Service's concern that by opening the eastern part of the existing closure area, snowmobiles would then be able to access the upper Big Smoky drainage. *Id.* Worried that increased traffic in this area would adversely affect mountain goats, wolverines, and lynx that reside there, this alternative closed off the headwaters of Big Smoky Creek and the headwaters of the South Fork of the Boise River so that snowmobiles could not access this area. Finally, under Alternative 2, the permitting system for the private landowners would be eliminated as no

---

[3] See Attachment 1.
[4] See Attachment 2.

longer necessary to give those landowners access to their private land. AR 441–43.

Under Alternative 3, the then-existing closure area and permit system would remain in place. AR 443–46. In addition, the Forest Service would expand the closure area to include all of the public land north of the original closure area. AR 443–46. Alternative 3 would prohibit both the private landowners and the public from using OSVs on all public land north of the closure area. AR 443–46.[5]

Under Alternative 4, the Forest Service would open the Couch Summit to Fleck Summit Corridor for public OSV use during the winter and would authorize 13.1 miles of new groomed snowmobile trail on the existing Forest Service roads. AR 446–47.[6] Under this alternative, the permit system would be eliminated, and the public would be able to access all the public land north of the existing closure area. AR 446–47. This alternative is the same as Alternative 2, except it does not close off the 72,447 acres in the northern part of the Analysis Area.

After considering comments and input from the public, the Forest Service selected Alternative 2 ("the Proposed Action"). AR 676. ISSA, WildEarth Guardians, and Winter Wildlands Alliance (i.e. the various parties in this action) objected to the proposal. *Id.* The Forest Service explained that it selected Alternative 2 because it strikes "a balance between providing over-snow vehicle access while offering some protection for wintering wildlife." AR 680. The Proposed Action eased access to an additional 138,993 acres to OSV recreation and provided an additional 13.1 miles of groomed trails. AR 682. However, the

---

[5] See Attachment 3.
[6] See Attachment 4.

Forest Service determined that the New Proposed Closure area (of 72,447 acres) was necessary in order to: (1) protect mountain goats by preventing disturbances that cause mountain goats to flee; (2) improve security for mapped, predicted Canada lynx habitat; and (3) reduce the potential disturbance to wolverines in their denning habitat. AR 676, 680-81.

ISSA took issue with the Forest Service's choice of Alternative 2 for multiple reasons. In its estimation, Alternative 4 (where the aforementioned trails and acreage would be opened, but nothing additional would be closed) was best supported by the evidence. ISSA raised these "evidence-based" concerns with the Forest Service during the public comment period.[7] Each concern related to the Forest Service's conclusions about the three types of wildlife just mentioned and can be summarized as follows:

First, ISSA noted that lynx had never been documented in the Analysis Area but acknowledged that the Analysis Area does contain some habitat that may be suitable for lynx. AR 468–71. ISSA pointed out that one set of lynx tracks was observed five miles outside of the Analysis Area to the north, but that this observation occurred more than 20 years ago. AR 469. In addition, one confirmed lynx was apparently taken 104 years ago outside of the Analysis Area approximately nine miles to the southwest. AR 469. Consequently, the EA concluded that "the probability of occurrence of lynx [in the Analysis Area] is considered low based on lack of known observations." AR 469. ISSA

---

[7] ISSA's request for Alternative 4 is mentioned only to provide background. This Court cannot instruct the Forest Service to choose Alternative 4 over Alternative 2 as the better alternative. Instead, as explained below, the Court must decide whether or not as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did.

asserts that this finding does not, therefore, support the Forest Service's ultimate conclusion that 72,447 acres needed to be closed to OSV travel (as part of Alternative 2) in order to protect lynx, and that Alternative 4 was the more logical plan in light of the evidence.

Second, while the EA concluded that wolverines are known to travel through the Fairfield Ranger District—including, but not limited to the area subject to closure under Alternative 2 (AR 477–81)—ISSA noted that multiple scientific studies have failed to locate any actual wolverine dens in the entire Fairfield Ranger District. AR 477–79. Further, ISSA argued that although the EA concluded there was a potential for two wolverine dens in the analysis area, even if the potential dens were assumed to exist, the EA admits "wolverines appear to tolerate winter recreation in their home ranges, including denning females." AR 479. As such, ISSA concludes that closure of this acreage is unnecessary to promote the Forest Service's stated goals of protecting wolverines.

Third, ISSA claims that although the EA concluded that a small population of mountain goats was known to exist in the north end of the Fairfield Ranger District (AR 459), this area was already open to snowmobiling and, "[i]n general, there is segregation between winter recreationists and wintering mountain goats since recreationists do not tend to seek out rocky, rugged terrain and low snow conditions as sought out by mountain goats." AR 462. ISSA also points to evidence showing that the mountain goat population has increased in recent decades—all while snowmobiles have been allowed in this same area.

In short, ISSA argued during the administrative proceedings that the Forest Service

relied on stale, misleading, or uncertain scientific data when reaching its determination that Alternative 4 was not appropriate. For those reasons, ISSA objected to the EA and the Forest Service's proposed adoption of Alternative 2. ISSA proposed that the Forest Service prepare an environmental impact statement ("EIS") in order to glean "additional clarification and current scientific data" from the area. AR 1544. The Forest Service, however, determined that an EIS was unnecessary and signed the "Over-Snow Vehicle Travel Management in the Northern Portion of the Fairfield Ranger District Final Decision Notice and Finding of No Significant Impact" (the "Decision") effectively adopting Alternative 2 on December 18, 2018. AR 672-89. This lawsuit followed.

### B. Procedural Background

ISSA filed the instant Complaint on May 29, 2019, requesting declaratory and injunctive relief regarding the Forest Service's Decision. Dkt. 1, at 2.

In its Complaint, ISSA identifies three causes of action: 1) Violation of the Administrative Procedure Act; 2) Violation of the National Environmental Policy Act – Failure to Rely on High-Quality Scientific Evidence; and 3) Violation of the National Forest Management Act. *Id.* at 10-11. As an administrative agency review lawsuit, discovery here was limited to the administrative record. Following a limited discovery period, the parties filed cross-motions for Summary Judgment. Dkts. 23, 26, 28.

For context, a brief history of the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA") is helpful.

#### 1. NEPA

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for

federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 558 (1978). NEPA imposes procedural, rather than substantive requirements, and it is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012). Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-1508, provide guidance for implementation of NEPA and are entitled to substantial deference. *Robertson*, 490 U.S. at 355.

Forest Service actions that directly affect the physical environment are generally subject to NEPA and are analyzed in either an EA or an EIS. Under NEPA, federal agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). To determine whether an EIS is required, an agency may first prepare a less detailed EA. *See* 40 C.F.R. § 1501.4; *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. If an EA leads the agency to conclude that the proposed action will *not significantly affect* the human environment, then the agency may issue a finding of no significant impact ("FONSI") and forego the further step of preparing an EIS. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998); *see also* 40 C.F.R. §§ 1501.4, 1508.13.

MEMORANDUM DECISION AND ORDER - 9

When reviewing an EA, the court determines whether the agency has taken a "hard look" at the consequences of its actions and provided a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 579 (9th Cir. 2016). Indeed, agency actions are entitled to a "presumption of regularity," and a court may not substitute its judgment for that of the agency. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (cleaned up).

When a court evaluates an agency's resolution of issues that require a high level of technical expertise, a "reviewing court must generally be at its most deferential." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 377 (1989). In *Marsh,* the United States Supreme Court recognized that the "question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Id.,* at 376. *Marsh* involved the potential construction of a dam and its effects on water quality, fish production, and angling. The agency relied on the opinions of independent and Corps experts while discounting opinions from two other biologists. That type of highly technical expert opinions is not present in this case.

### 2.  *NFMA*

NFMA requires that the Forest Service develop and maintain a forest plan for each national forest. 16 U.S.C. § 1604(a). A forest plan "is a broad, long-term planning document [that] establishes goals and objectives for management of forest resources." *Earth Island Inst. v. U.S. Forest Serv*., 697 F.3d 1010, 1014 (9th Cir. 2012) (citing 16 U.S.C. § 1604(g)(1)–(3)). The Forest Service "then implements the forest plan by

approving or disapproving site-specific actions." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). NFMA requires that proposed actions be consistent with the forest plan. 16 U.S.C. § 1604(i). "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Weldon*, 697 at 1056.

"NFMA embraces concepts of 'multiple use' and 'sustained yield of products and services,' obligating the Forest Service to 'balance competing demands on national forests, including timber harvesting, recreational use, and environmental preservation.'" *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 801 (9th Cir. 2005). The Forest Service has broad discretion in balancing these competing objectives.

> The NFMA gives the Forest Service flexibility because the Service has many different goals—conservation, commerce, recreation, and so on. The statute reflects a congressional judgment that balancing these goals calls for policy judgments—judgments that often require trade-offs among worthy objectives. . . . Congress left such judgments to a politically responsive agency with relevant expertise. . . . Courts are not well-equipped to police the substance of these judgments. Instead, we employ procedural tools: In a nutshell, the agency must rationally explain why it did what it did.

*In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017).

### III. LEGAL STANDARD

A court's review of an agency's compliance with both NEPA and NFMA is governed by the Administrative Procedure Act ("APA"). *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure Act." (quoting *Native*

MEMORANDUM DECISION AND ORDER - 11

*Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005)).

"Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). However, because of the court's limited review under the APA, the summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are sought in agency review cases. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014).

In this context, the Court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).[8]

---

[8] The oft-used "arbitrary and capricious" standard in APA cases includes other grounds for overturning agency action. The Court's scope of review is as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>   (1) compel agency action unlawfully withheld or unreasonably delayed; and
>   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>       (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>       (B) contrary to constitutional right, power, privilege, or immunity;
>       (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>       (D) without observance of procedure required by law;
>       (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

The standard is highly deferential and presumes the agency action is valid. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quotation omitted), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). "The agency's action . . . need only be a reasonable, not the best or most reasonable, decision." *River Runners*, 593 F.3d at 1067 (cleaned up).

Thus, the Court may not overturn an agency decision "because it disagrees with the decision or with the agency's conclusions about environmental impacts." *Id.* at 1070. It must "affirm[] the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All.*, 475 F.3d at 1140.

However, a court must inquire whether the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Port of Seattle, Wash. v. F.E.R.C.,* 499 F.3d 1016, 1035 (9th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*,

---

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. While the Court has considered all of these factors, for brevity, it often simply uses the phrase "arbitrary and capricious." This phrase, however, naturally encompasses all of the relevant grounds outlined in § 706.

463 U.S. 29, 43 (1983)).

An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alliance for the Wild Rockies v. Savage,* 354 F. Supp. 3d 1185, 1187 (D. Mont. 2018) (quoting *Motor Vehicle Mfrs.,* 463 U.S. at 43).

Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious. *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067 (9th Cir. 1979).

Finally, as recently explained by the United States Supreme Court, it is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907–08 (2020). If those grounds are inadequate, a court may remand for the agency to do one of two things: first, the agency can offer "a fuller explanation of the agency's reasoning *at the time of the agency action*." *Id*.[9] Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action. *Id. (*quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).[10]

---

[9] This route has important limitations. When an agency's initial explanation "indicate[s] the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones. *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)).

[10] An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action. *Id.*

MEMORANDUM DECISION AND ORDER - 14

# IV. ANALYSIS

The parties naturally have differing views on the validity of ISSA's claims and argue the underlying substantive matters. However, the Forest Service and Inter

## A. Procedural Arguments

### 1. Standing

A plaintiff has standing if: "(1) it has suffered an 'injury in fact' . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). In environmental cases such as this, plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). In addition, an association has standing "to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth,* 528 U.S. at 181.

Here, the Forest Service contends that ISSA does not have standing to bring suit because it cannot establish a concrete injury in fact to any of its members or that a favorable decision would redress its claimed injury.

MEMORANDUM DECISION AND ORDER - 15

a. <u>Injury in Fact</u>

First, the Forest Service notes that until the Decision was issued, the entire Analysis Area was effectively closed to the general public, including ISSA and its members, for motorized use. AR 432, AR 462. Because the road between the Couch Summit and Fleck Summit through the existing closure was *the only road* to the area north of the corridor—and because that road was *not* open to anyone without a permit during winter months—ISSA members did not have actual access to the area. Because ISSA did not have actual access to the northern area then, and, under the Decision, do not have legal access now, the Forest Service argues their members have not actual suffered any injury as a result of the northern area being officially closed.

ISSA disagrees. It claims broadly that it has an interest in winter recreation in the Fairfield Ranger District and represents its members in that interest. More specifically, however, ISSA provides the declaration of one of its members, Steve Shay, who declares that he "snowmobiled in the northern portion of the Fairfield Ranger district, including the area now closed to snowmobile travel." Dkt. 23-3, ¶ 5.

The Forest Service takes issue with Shay's declaration, asserting that because the pre-EA closure area and terrain effectively cut off access to the northern part of the district, Shay must have accessed the area illegally and, therefore, his declaration cannot support ISSA's standing argument. *See, e.g., Lujan,* 504 U.S. at 560 (standing requires a "legally protected interest"). ISSA counters that by the Forest Service's own admission, while access to the northern area was difficult, it was not impossible, and the EA specifically noted there were "a limited number of snowmobilers" who would access the Fairfield

Ranger District from the north. AR 433. While not discounting the fact that the area was accessible, the Forest Service is still not convinced that Shay had legal access to the area because he has not indicated that he was one of the "very few individuals who have sufficient skill to access the area from the north, or had a special use permit." Dkt 30, at 5.

While a declaration from Shay outlining exactly how he accessed the area in question would have settled this issue conclusively, such is not required. It is clear from the record that the area *was* accessible to the public. While that access may not have been easy, the area was not legally "closed" or "restricted," and there is no reason to doubt that people legally accessed the area of their own volition—and via other means than the Couch Summit to Fleck Summit Corridor. Would illegal access negate Shay's declaration and, therefore, likely ISSA's standing? Potentially. But the Forest Service does not have any evidence that Shay accessed the area illegally. It simply contends that because Shay has not affirmatively said he accessed it legally, the opposite must be true. The Court, however, will not assume Shay illegally accessed the area absent *some* evidence to suggest this.

The Forest Service's Decision in this case closed access to over 72,000 acres of the Analysis Area that was previously open to OSV travel. This is an articulatable injury and Shay has shown he is a member of the class of individuals who suffered that injury.  With Shay's declaration intact, the Court finds ISSA has standing to bring its claims.

    a.  Favorable Decision

Second, the Forest Service contends that a Court decision favorable to ISSA would not allow ISSA members to access the New Proposed Closure area in any event. Instead, if the Court remands the Forest Service's Decision, the existing Winter Wildlife Closure

MEMORANDUM DECISION AND ORDER - 17

would be reinstated pending further analysis, and the northern area would remain closed. ISSA did not address this argument in briefing or at oral argument. However, it must be noted that the Forest Service's position is not accurate. If the Court remands, it is true the Winter Wildlife Closure that existed pre-EA would be reinstated pending further analysis, but it is not true that the northern area would be closed. As before, the northern area would remain open, it would just be difficult to access. This alone defeats the Forest Service's argument regarding the impact of a favorable decision.

Having said that, this argument does concern the Court to some degree. Because the Court's review is limited to assessing whether the Forest Service's decision was *an* appropriate choice (not the only or best choice), it is unclear what actions the Forest Service would take if the Court remands the case for further analysis and whether those actions, if any, would ultimately benefit ISSA or not.

Clearly, ISSA once again gaining immediate access to the desired area defeats the Forest Service's argument on this issue, but immediate access is not the sole favorable result that could be achieved in this litigation. A remand in itself could be considered a victory for ISSA. In addition, upon remand, the Forest Service might perform an EIS— something ISSA seeks—or take other action as a result of this litigation that would be considered favorable to ISSA.[11] In short, the Court finds this argument unpersuasive and concludes that ISSA has standing to pursue its claims.

Having determined ISSA has standing, the Court turns next to additional procedural

---

[11] For example, the Forest Service may choose to modify the EA, consistent with *Dep't of Homeland Sec.*, 140 S. Ct. at 1907–08, which may or may not benefit ISSA.

arguments raised by Intervenors and the Forest Service against ISSA.

2. *"EIS" Claim*

Intervenors assert that ISSA's briefing regarding Count Two: Violation of the National Environmental Policy Act – Failure to Rely on High-Quality Scientific Evidence, focuses solely on its contention that the Forest Service failed to complete an EIS in this case. Intervenors further assert that because ISSA never actually raised a "failure to complete EIS" claim at the administrative level, their NEPA claim as a whole must be dismissed. In Intervenors' estimation, because ISSA's NEPA claim focuses exclusively on the Forest Service's purported failure to cite high quality scientific evidence in support of its conclusions (and not its failure to undertake an EIS), ISSA's "claim" here (in briefing) that the Forest Service needed to perform an EIS cannot stand under Federal Rule of Civil Procedure 8.

ISSA counters that its contention that the Forest Service did not perform an EIS is simply part of its claim that the Forest Service failed to rely on high-quality scientific data. Under the circumstances, the Court must agree.

NEPA requires an agency to use detailed and quality information so that it will "not act on incomplete information, only to regret its decision after it is too late to correct." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000). As noted, an agency must prepare an EIS if the proposed agency action will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502. Generally, an agency's decision will have a significant effect and an EIS will be required if "the possible effects on the human environment are highly uncertain[.]" 40 C.F.R. § 1508.27; *Barnes v.*

*U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011). Indeed, "[p]reparation of an EIS is *mandated* where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential effects." *Barnes*, 655 F.3d at 1140 (cleaned up).

In this case, ISSA has argued since the outset that the beneficial effects of the snowmobile ban were highly uncertain, that the Forest Service could have resolved the uncertainty by collecting more data, and that an EIS should have been performed even though the ban would purportedly benefit the environment. Said differently, ISSA's argument that the Forest Service had a duty to rely on better scientific evidence *includes* its assertion that the Forest Service should have prepared an EIS.

In short, the Court finds Intervenors' argument unpersuasive. ISSA's NEPA claim need not be dismissed on procedural grounds for failure to specifically claim the Forest Service failed to perform an EIS. That assertion is part and parcel to ISSA's second cause of action that the Forest Service violated NEPA.

### 3. Count One: APA Claim

Count One of ISSA's Complaint alleges that the Forest Service violated the Administrative Procedure Act (APA). In its opening Summary Judgment brief, the Forest Service argues that Count One must be dismissed because the Ninth Circuit has held such a claim is not viable as a stand-alone claim since arbitrary and capricious review cannot be conducted in the absence of another statute. *Oregon Nat. Res. Council*, 92 F.3d at 798; *see also Int'l Bhd. of Teamsters v. U.S. Dep't of Trans.*, 861 F.3d 944, 955 (9th Cir. 2017) ("arbitrary and capricious review does not apply in the absence of a statutory benchmark

against which to measure an agency's exercise of discretion"); *Rocky Mountain Oil & Gas Ass'n v. U.S. Forest Serv.*, 157 F. Supp. 2d 1142, 1145 (D. Mont. 2000), *aff'd*, 12 F. App'x 498 (9th Cir. 2001) ("arbitrary and capricious review cannot be conducted under the APA independent of another statute.").

In its Reply Brief, ISSA includes a section entitled "Defendants' Application of the Minimization Criteria was Arbitrary and Capricious and Violated the APA." Dkt. 29, at 7. This appears to be an attempt to save Count One by providing the statute on which the APA claim is based. In this section, ISSA claims that pursuant to the Code of Federal Regulations, the Forest Service must seek to minimize "harassment to wildlife and significant disruption of wildlife habitats" and that this standard is known as the "minimization criteria." *Id.* (citing 36 C.F.R. 212.55). ISSA claims that the Forest Service did not take the minimization criteria into account when designating trails, roads, and other areas during the administrative process. As a result, ISSA contends the Forest Service's Decision was arbitrary and capricious because the Forest Service claimed it was closing the northern acreage in order to prevent the harassment of lynx, wolverines, and mountain goats when there was no evidence to support such a finding.

The Forest Service and Intervenors forcefully respond that this argument is essentially an entirely new claim (making it procedurally improper at this stage) and that it must be dismissed outright. Both the Forest Service and Intervenors note that ISSA never raised any concerns about the "minimization criteria" during the administrative process, never pleaded such concerns in its Complaint, and only raised this issue for the first time in its Reply brief after being confronted about its APA claim's shortcomings. The Court

must agree.

First, caselaw is clear that APA claims cannot be raised for the first time in litigation— they must be raised during the administrative process. 36 C.F.R. § 218.14(b); *see also* 7 U.S.C. § 6912(e); 40 C.F.R. § 1501.1(d) (requiring comments to "[i]dentify[] at an early stage the significant environmental issues"). The APA and Forest Service regulations require that plaintiffs exhaust their administrative remedies before bringing an issue to federal court. 36 C.F.R. § 218.14(b); 7 U.S.C. § 6912(e); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) (the purpose of the public comment period is to ensure the agency is given an opportunity to resolve concerns). In order to exhaust administrative remedies, claims raised during the administrative process must be "so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846-47 (9th Cir. 2013). It is thus premature and inappropriate for a federal court to review a claim that was not first presented to the Agency.

Here, the record is clear that ISSA engaged with the Forest Service in a lengthy administrative process. However, there was no indication or allegation (by ISAA or anyone else) during that process that the Forest Service failed to comply with the minimization criteria in its designation of roads, trails, and other areas as set forth in 36 C.F.R. § 212.55. A plaintiff "must structure [its] participation so that it . . . alerts the agency [of its] positions and contentions, in order to allow the agency to give the issue[s] meaningful consideration." *Dep't. of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). This is reason

alone to dismiss ISSA's "minimization" claim (and thus Count One).

Second, there is no mention of the "minimization criteria" anywhere in ISSA's Complaint. This violates the text, and spirit, of Federal Rule of Civil Procedure 8.

Finally, while passing reference is made in ISSA's opening brief for summary judgment to "minimization criteria," it is not in the context of a claim, but rather as part of its discussion regarding the regulatory framework at issue in APA cases. Dkt. 26, at 18. Truly, the first time ISSA raised this issue was in its reply brief. Such is inappropriate.

Because ISSA's "minimization criteria" argument was not raised in the administrative proceedings below, was not pleaded in its Complaint, and was only argued in subsequent summary judgment briefing, the Court will strike Count One and the newly raised minimization criteria argument.[12]

## B. Substantive Arguments

With ISSA's first claim (that the Forest Service Violated the APA) dismissed, the Court next turns to ISSA's remaining two claims: Count Two, Violation of the National Environmental Policy Act – Failure to Rely on High-Quality Scientific Evidence; and Count Three, Violation of the National Forest Management Act.

### 1. Count Two – NEPA violation

Under NEPA, an agency must use detailed and quality information so that it will "not act on incomplete information, only to regret its decision after it is too late to correct."

---

[12] This does not mean that the APA has no part in this litigation. It does. Afterall, the 9th Circuit has held that "Judicial review of an agency's compliance with NEPA is governed by the APA, which requires this court to set aside the agency's action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Pacific Rivers Council v. U.S. Forest Service,* 689 F.3d 1012 (9th Cir. 2012).

*Friends of the Clearwater*, 222 F.3d at 557.

In this case, the Forest Service undertook an extensive and time-consuming EA—among other data-driven projects—in order to have as much information as possible when making its Decision. Ultimately, the Forest Service concluded that Alternative 2 was the best way to balance the interests involved, that implementing this alternative would have no significant impact on the quality of the human environment, and that an EIS was unnecessary. ISSA strongly disagrees with this conclusion, arguing the effects of the snowmobile ban are highly uncertain and that the Forest Service's Decision makes various assumptions that are unsupported by the evidence. These perceived errors boil down to the Forest Service's analysis of the impact the alternatives would have on three separate groups of wildlife: lynx, wolverines, and mountain goats.[13]

First, ISSA claims the Decision assumes that the snowmobile ban will protect lynx without any proof that lynx actually live in or near the Analysis Area. According to the EA, "[t]he closest, most recent, credible observation was a report from a US Fish and Wildlife Service biologist of lynx tracks near Alturas Lake in 1998 approximately five air-miles to the north of the analysis area. . . ." AR 469. Interestingly, there has never been a credible report of lynx within the Analysis Area and the EA concluded that "no effect to mapped, predicted lynx habitat would result" from "dispersed oversnow vehicle use." AR 472. ISSA contends that these clear findings in the EA are inconsistent with the Forest

---

[13] The EA in this case analyzed the effects of the four alternatives on five groups of wildlife: lynx, wolverines, mountain goats, elk, and gray wolves, but ISSA only takes issue with the Forest Service's findings with respect to lynx, wolverines, and mountain goats.

Service's Decision that the snowmobile ban will "improve security for mapped, predicted Lynx habitat. . . ." AR 680. ISSA further contends that this inconsistency makes the Forest Service's conclusion arbitrary and unreasonable.

Second, ISSA contends the Forest Service's Decision assumes there are wolverine dens in the Analysis Area when no wolverine dens have ever been observed there. The EA found that a wolverine study conducted from 1992 to 1995 did not discover any wolverine dens in the Analysis Area. AR 477–79. Then, in 2008, one wolverine den was observed approximately a quarter of a mile to the west, outside of the Analysis Area. AR 477–79. The EA mentions no reports or personal observations of wolverine dens in the Analysis Area at any time. However, the EA concludes that "based on the number of wolverine observations throughout the analysis area, it is expected that potentially up to two dens may occur." AR 477– 79. This conclusion appears to have been based upon the "personal observation" of David Skinner, a Forest Service wildlife biologist. Even then, however, ISSA argues that because the EA concedes that "[i]ndividual [wolverines] generally have very large ranges and can cover large distances in very little time," AR 477, the fact that wolverines have at times been observed in the Analysis Area does not mean those wolverines actually have dens in the Analysis Area. ISSA contends this error could be cured by collecting more recent data regarding the actual number and location of wolverine dens, if any, in the Analysis Area.

Third, ISSA claims the EA and Decision assume that dispersed snowmobile use will negatively impact wintering mountain goats without citing high-quality scientific evidence. The EA admits that "[i]n general, there is segregation between winter recreationists and

wintering mountain goats since recreationists do not tend to seek out rocky, rugged terrain and low snow conditions as sought out by mountain goats." AR 462. However, the EA concludes that there is still a "potential for interaction" because mountain goat habitat in the Analysis Area is interspersed with "areas potentially sought out by recreationists." AR 462. According to the EA, these potential interactions could have a negative impact on mountain goats, but the EA admits that the scientific literature is sparse regarding this issue. AR 462. According to ISSA, the EA's analysis on this topic is based on speculation, not evidence or data.

In sum, ISSA asserts the Forest Service's conclusions regarding lynx, wolverines, and mountain goats are mostly based on assumptions and lack a reasonable connection to the evidence in the EA. ISSA maintains this disconnect could have been avoided if the Forest Service had either followed the findings or collected additional data and drafted an EIS. ISSA takes the position that the Forest Service's failure to do either of these things was arbitrary and capricious.

In response, the Forest Service begins by noting that "high-quality scientific evidence" is not a standard under the NEPA. The Court agrees. ISSA does not cite any authority for this proposition that high-quality scientific evidence is required and, to the contrary, the Ninth Circuit has found that NEPA does not require the Court to decide whether the Forest Service used perfect, flawless, or even "the best scientific methodology available." *The Lands Council*, 537 F.3d at 1003. Instead, the Court is tasked with ensuring the Forest Service made no "clear error of judgment" that would render its action "arbitrary and capricious." *Id.; see also Marsh,* 490 U.S. at 378 (the reviewing court "must consider

whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). Were the Court to require something more, "government actions affecting the environment, positively or negatively, could be hamstrung by the need for unattainable scientific certainty." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109 (9th Cir. 2016). So, while the Court is not looking for any specific "high-quality scientific evidence," it must nevertheless determine whether the choices made by the Forest Service were rationally related to the evidence in the record.

Against that backdrop, the Court now summarizes the Forest Service and Intervenor's arguments related to these groups of wildlife and why the evidence in the record is insufficient to support the Forest Service's Decision.

The Forest Service does not disagree with ISSA regarding the extremely low probability of lynx existing in the Analysis Area. In fact, the EA specifically noted that "within the analysis area, the probability of occurrence of lynx is considered low based on lack of known observations." AR 469. That said, the EA also concluded that "based on professional judgment, past lynx populations to the north of the analysis area, the presence of potential habitat, and the relative remoteness of the north end of the analysis" there is "a higher probability of a lynx occurring" in the northern area than in any other area of the Fairfield Ranger District. *Id.* The Sawtooth National Forest Land and Resource Management Plan (the "Forest Plan"), outlines that proactive measures should be taken to maintain lynx habitat and promote opportunities for lynx connectivity even though the likelihood of lynx occurring in the area was low. AR 470-72. In accordance with the Forest Plan, the Decision noted that choosing Alternative 2 would improve security for "mapped,

*predicted* Canada lynx habitat." AR 680.

In regard to protecting wolverines, the Forest Service notes that while ISSA makes much of the fact that there are no recorded wolverine dens in the Analysis Area, they cannot disagree that wolverines exist in the area. This is supported by the record. AR 746-80. There is evidence that wolverines travel in the Analysis Area. In the Forest Service's estimation, whether they actually *live* in the area is of little consequence. As ISSA correctly noted, these animals occupy expansive geographical areas[14], and thus, their interactions with humans (whether in and around their dens or just while travelling) appear likely. And while there is no concrete proof that any wolverine dens exist in the Analysis Area, the Forest Service argues it is allowed to rely on its experts who believe that, based on wolverine travel patterns, there likely are perhaps two wolverine dens in the Analysis Area.

Finally, the Forest Service agrees with ISSA that mountain goats and humans interact infrequently, appear to tolerate one another, and that the mountain goat population in the Analysis Area has actually increased over the years. That said, the Forest Service asserts none of those facts negate the need to protect mountain goat habitat moving forward. As the EA notes, the Forest Plan specifically outlines one of its goals is to protect mountain goat habitat and mitigate human disturbances. AR 462-63. The EA outlines that approving Alternative 2—as opposed to Alternative 4—better comports with that mandate. AR 467-68.

Returning to NEPA and the concept that NEPA's goals are "satisfied once

---

[14] In central Idaho, home ranges average 148 square miles for females and 582 square miles for males. AR 477.

[environmental] information is properly disclosed," *Inland Empire Pub. Lands Council v. U.S. Forest Serv*., 88 F.3d 754, 758 (9th Cir. 1996), the Forest Service concludes that it has satisfied NEPA's goal of disclosing relevant information and that its Decision stands. Because NEPA exists only "to ensure a process, not to ensure any result," *id.*, the Forest Service maintains ISSA's complaints about the underlying data are irrelevant. While it is true that NEPA outlines a process and does not mandate any specific results, the results, must, nevertheless, be based on accurate, non-stale information. Furthermore, any subsequent decisions must be rationally related to that information.

After preparing an EA and issuing a FONSI for its Proposed Action (of implementing Alternative 2), the Forest Service decided not to prepare an EIS. *See In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014); *Blue Mountains Biodiversity*, 161 F.3d at 1212; *see also* 40 C.F.R. §§ 1501.4, 1508.13. But, it is not the Forest Service's decision to do only an EA and not an EIS that concerns the Court. Instead, it is the lack of a reasonable connection between the research relied upon and the conclusions in the EA that concerns the Court.

In other words, it is not the Forest Service's decision to forego an EIS or even its decision to choose Alternative 2 over Alternative 4 that creates an arbitrary, capricious decision. It is the lack of connection between the evidence in the record and the Forest Service's conclusions that is at issue. ISSA itself concedes that the Forest Service must prepare an EIS only when a proposed action will *significantly affect* the quality of the human environment. Dkt. 23, at 18 (citing 42 U.S.C. § 4332(C)). The Court's role is not to substitute its judgment for that of the agency and determine whether Alterative 2 or

Alternative 4 was the "correct" choice. Instead, the Court's inquiry is whether the agency examined the relevant data and articulated a satisfactory explanation for its action—including a rational connection between the facts found and the choices made.

The Court acknowledges that its review of agency action is "highly deferential." *Cal. Wilderness Coal.*, 631 F.3d at 1084. That said, the deference owed an agency is not unlimited. *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). The Court does "not automatically defer to any agency's conclusions, even when those conclusions are scientific." *Id.* (quoting *Marsh*, 490 U.S. at 378). Rather, the Court's review must be "sufficiently probing" to ensure that the agency's decision is "founded on a reasoned evaluation of the relevant factors." *Id.* at 995.

In this case, the Court is concerned that while the Forest Service went through the appropriate steps under NEPA, its Decision was not "founded on a reasoned evaluation of the relevant factors." *Id.* Thus, the Court is not impermissibly substituting its judgment for that of the agency, but is reviewing the decision-making process the agency went through. *See Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1158 (9th Cir. 1980) ("Under the APA, courts must refrain from de novo review of the action itself and focus instead on the agency's decision-making process.").

In this case, while the Forest Service has done substantial work on this project, its conclusions are, frankly, a stretch based upon the evidence in the record. For example, it is hard to accept the Forest Service's conclusion that there are likely two wolverine dens in

the Analysis Area when none have been observed there for decades.[15] And while the Forest Service is correct that it "must have discretion to rely on the reasonable opinions of its own qualified experts," *see Marsh*, 490 U.S. at 378, any expert opinions must be supported by "both [] analysis and data." *Granat v. United States Dep't of Agric.*, 238 F. Supp. 3d 1242, 1248 (E.D. Cal. 2017), aff'd, 720 F. App'x 879 (9th Cir. 2018). So, while the Forest Service's expert, David Skinner, opined that there *might* be up to two wolverine dens in the Analysis Area, it is hard to accept that without competent evidence to support such a conclusion.

In like manner, it is somewhat odd that the Forest Service found that humans and mountain goats interact harmoniously, but then determined that an alternative had to be selected that would limit those interactions.

Most striking, however, is the data regarding lynx. Absent from the record is any credible evidence that lynx have been observed in the Analysis Area. One was apparently seen over 20 years ago—but that was five miles north of the Analysis Area—and one was apparently taken over 100 years ago—but again, this was nine miles outside of the Analysis Area. To conclude that such is sufficient to prohibit OSV use in order to protect lynx strains reason.

The Ninth Circuit has "warned that general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive

---

[15] It is even harder to accept the Forest Service's implication that although the Analysis Area has 55,496 acres of potential wolverine denning habitat, with about 83% of this habitat occurring across the entire Fairfield Ranger District, the two potential dens would be in the northern portion of the Analysis Area. AR 479.

information could not be provided." *Blue Mountains Biodiversity*, 161 F. 3d at 1213.

In this case, the Forest Service's conclusions are speculative. The Court returns to the fundamental question of whether the Forest Service's Decision in this case was "reasonable." There is nothing inherently wrong with using dated evidence such as was used here *if that evidence is still valid*. There is also nothing inherently wrong with supporting a conclusion with limited data *if there is a sufficient connection between the two*. But when the Court reviews the record in this case, there is both dated evidence and extremely limited data. What's more, the conclusions the Forest Service derived from that data are not harmonious with the data. When reviewing the entirety of the evidence in the record, the Court finds the Forest Service has not articulated a rational connection between the evidence obtained and the conclusions it reached.

Accordingly, summary judgment is appropriate in ISSA's favor on Count Two.

2. *Count Three – NFMA violation*

Under the NFMA, any Forest Service decision must be consistent with the Forest Plan. 16 U.S.C. § 1604; *Greater Yellowstone Coal. v. U.S. Forest Serv.*, 12 F. Supp. 3d 1268, 1273 (D. Idaho 2014). The Forest Plan in this case states that its goals include providing "an array of winter recreation experiences, while mitigating conflicts between motorized and non-motorized use and wintering wildlife." AR 499, AR 8910. The Forest Plan does this by providing "networks of marked and designated snow machine . . . routes and trailhead facilities" and "opportunities for backcountry winter recreation in areas without wintering wildlife conflicts." AR 499–500, 8911. Finally, the Forest Plan's Desired Condition for Recreation Resources includes providing "primitive settings where

there are opportunities for solitude risk, and challenges"; "management of dispersed activities"; and "dispersed recreation sites." AR 609, 8909. The Forest Plan strives to do this while also protecting wildlife habitat and limiting human disturbance. AR 8869-70

ISSA contends that the Forest Service's Decision is inconsistent with the Forest Plan because it eliminates a unique, high elevation, high-volume snow experience that exists nowhere else in the analysis area without first identifying sufficient evidence of conflicts with wintering wildlife. ISSA claims that it recognizes the need to restrict recreation when that recreation would harm wintering wildlife, but suggests that the Decision in this case does not provide any convincing evidence that snowmobile use in the closure area would cause conflicts with wintering wildlife. As a result, ISSA argues the Forest Service violated the NFMA because its Decision is contrary to the Forest Plan. The Court disagrees.

It is important to note that while the Forest Plan includes aspirational goals, there is no language requiring that the Forest Service allow snowmobiling in any particular area of the Forest, over a certain number of acres, or on certain types of terrain.

Thus, while the Court finds that the Forest Service's actions were not in substantial compliance with the requirements of NEPA, the same cannot be said when reviewed under the NFMA. Simply put, whichever alternative the Forest Service chooses in this case (now or in the future) it is difficult to say that choice does not comport with the Forest Plan because each alternative supports the plan—just in different variations. Said differently, regardless of whether the Forest Service opens or closes 10 acres or 10,000 acres, as long as it strives to balance "an array of winter recreation experiences, while mitigating conflicts between motorized and non-motorized use and wintering wildlife" (AR 499, AR 8910)—

MEMORANDUM DECISION AND ORDER - 33

exactly what it is trying to balance in this case—the Court cannot say that the Forest Service's actions violate the Forest Plan.

In sum, the Forest Service's motion for summary judgment is appropriate on Count Three because there is no indication the Forest Service violated the NFMA or its own Forest Plan.[16]

## V. CONCLUSION

As an organization, the Forest Service is charged with a difficult task: managing national forest lands with multiple goals in mind, including pleasing the public or specific groups with widely varying interests. This case presents an example of this conflict—particularly Claim Two. Simply put, whichever alternative the Forest Service chose, someone was likely to be unhappy. Nevertheless, in cases such as this, the Court's role is not to choose the course of action it deems best, but "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.* 753 F.2d at 769.

In relation to Claim One—ISSA's APA Claim—the Court finds that it was not sufficiency pleaded and must be dismissed as a matter of law.

Regarding Claim Two and the Forest Service's actions under NEPA, the Court finds that, upon review, the evidence *does not* support the Forest Service's conclusions. By all accounts the evidence suggests that lynx, wolverines, and mountain goats either are not

---

[16] Again, even taking into account the Court's conclusion that the Forest Service's selection of Alternative 2 was procedurally flawed, the Court cannot say this indicates the Forest Service violated NFMA because regardless of which plan it chose, it would still have been upholding its mandate under the Forest Plan to balance winter recreation and wildlife protection.

present in the Analysis Area or would reasonably tolerate human interaction. Thus, it is difficult to understand why the Forest Service then determined that OSV use in the area needed to be restricted. Ultimately, the Court fails to see a "rational connection between the fact found and choices made." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Because substantial questions exist regarding the environmental impact of the Forest Service's Decision, the Court grants summary judgment in ISSA's favor on Count Two and remands the case to the Forest Service.

Finally, notwithstanding the Court's analysis and conclusion regarding ISSA's NEPA claim, it finds that it cannot grant summary judgment to ISSA on Count Three—violation of NFMA—because the Forest Service did not violate the governing Forest Plan. The plan seeks balance. That is what the Forest Service did here. Summary judgment is therefore appropriate in the Forest Service and Intervenor's favor as to Count Three.

## VI. ORDER

1. ISSA's Motion for Summary Judgment (Dkt. 23) is GRANTED in PART and DENIED in PART.  The Motion is granted as to Claim Two (NEPA), but denied as to Claim One (APA) and Claim Three (NFMA).

2. The Forest Service's Motion for Summary Judgment (Dkt. 26) is GRANTED in PART and DENIED in PART. The Motion is granted as to Claim One (APA) and Claim Three (NFMA), but denied as to Claim Two (NEPA).

3. Intervenors' Motion for Summary Judgment (Dkt. 28) is GRANTED in PART and DENIED in PART. The Motion is granted as to Claim One (APA) and Claim Three (NFMA), but denied as to Claim Two (NEPA).

4.  The Forest Service's Decision is hereby reversed and remanded to the United States

    Forest Service for further analysis consistent with this decision.

5.  The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: February 10, 2021

David C. Nye
Chief U.S. District Court Judge